## DORSEY ENTERPRISES, INC., ET AL. *v.* SHPAK

[No. 104, September Term, 1958.]

*Decided January 23, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Charles E. Hogg,* for appellants.

*T. Hunt Mayfield* and *Bernard F. Goldberg,* for appellee.

BRUNE, C. J., delivered the opinion of the Court.

This zoning case originated with the filing of an application by the appellee, Shpak, for a special permit to operate an automobile junk yard in Howard County on property near the intersection of the Washington Boulevard (U. S. Route 1) and the Dorsey Road. Shpak had entered into a contract with one Maria Gattuso for the purchase of the property in question upon condition that such a permit be obtained. After a hearing the Board of Zoning Appeals denied Shpak's petition therefor, and he sought a review of the case by the Circuit Court for Howard County. In that court, the appellants, Dorsey Enterprises, Inc. and Carl W. Meyer, acting both individually and as President of Dorsey Enterprises, Inc., intervened in opposition to Shpak. Following a hearing the court reversed the Board of Zoning Appeals and issued an order directing the Board "to issue said permit, as applied for, subject, however, to such reasonable regulations as said Board may, in its sound discretion, impose, and subject also to the approval of the County Health Officer in accordance with the provisions of Section 23 of the Zoning Regulations of Howard County." The intervenors appealed from that order.

The record is unusual in that there is no transcript of the testimony taken before the Board of Zoning Appeals. The reason for that is that the operator of the recording machine thought that it was set so as to record the testimony, but actually it was not correctly set and it did not record the proceedings. The parties proceeded to take testimony in the Circuit Court which, we were informed at the argument in this Court, was on the whole very similar to that presented before the Board. Both sides apparently acquiesced in going ahead in the trial court on the basis of testimony to be taken there, and no objection appears to have been made to the absence of any testimony taken before the Board. In this Court the appellee Shpak, who was the appellant below, has sought in his brief

to make some point of there being no evidence in the record to support the action of the Board. Since the burden was his in the trial court to show, if he could, that the determination of the Board was erroneous, it would seem that it was incumbent upon him, rather than upon the Board or the objectors, to produce the evidence which was before the Board. We find no merit in the appellee's argument on this point.

We think that it would have been better either to have sent the case back to the Board for the taking of testimony or at least to seek from the Board a certification of the substance of the evidence. However, since the provisions of 1957 Code Art. 66B, Sec. 22 (1) and of Sec. 25 D of the Zoning Regulations of Howard County are both rather broad with regard to the taking of testimony in the Circuit Court, we shall not remand the case for that purpose.

The subject property lies on the southeasterly side of the Washington Boulevard and has a frontage of approximately 200 feet on that road. It runs back with this width to a depth of approximately 71 feet. It then widens out to 455 feet and extends in depth an additional 1060 feet. In this general vicinity property on each side of the Washington Boulevard for a depth of 300 feet is zoned as M-1, which might be described briefly as light manufacturing. On the northwest side of the Boulevard beyond the 300-foot line, property is zoned residential. On the southeast side beyond the 300-foot line in this general vicinity the property is zoned M-2, which might be briefly described as heavy manufacturing or heavy industrial. An automobile junk yard is not permitted in an M-1 zone at all. Such a junk yard may be established in an M-2 zone, if a special permit therefor is granted by the Board of Zoning Appeals. The rear portion of the Gattuso tract is zoned M-2.

Section 23 of the Zoning Regulations of Howard County provides that, subject to the limitations, guides and standards provided in Section 24, the Board of Zoning Appeals shall have power, among other things, "A. To approve any use of land or building not permitted as a matter of right in the M-2 District where the Board finds the proposed use would not menace the public health, safety, morals, or general welfare

of the community or would prevent the most appropriate use of land, * * *." Section 23 A further provides that before the Board of Appeals shall approve any use thereunder it shall refer the matter to the County Health Officer for a report concerning the health hazard, if any, involved. It further provides that the Board may impose such reasonable safeguards and conditions in granting any application approved under this subsection as will protect the surrounding properties and encourage the most appropriate use of land in harmony with the purpose and intent of these regulations.

Section 24 of the County Zoning Regulations provides in part that where the approval of the Board of Appeals is required before a permit may be issued the Board shall examine the specific property involved and the neighborhood, and further provides that the application shall not be approved where the Board finds the proposed use would menace the public health, safety, security, morals or general welfare. It further provides that in deciding such matters the Board shall give consideration, among other things, to the orderly growth of the community, the reasonable needs of the entire community and particular neighborhoods, the purpose of these Regulations as provided in Sections 1 and 2, the effect of odors, dust, gas, smoke, fumes, noise upon the use of surrounding properties, and the most appropriate use of land. One of the objectives stated in Section 1 of the Regulations is to prevent blight and property deterioration. Section 1 also uses the general terms of promoting the health, safety, morals and general welfare of the community. Section 2 sets forth a number of things to be taken into consideration for the purposes set forth in Section 1. These include the most appropriate use of land, the conservation and stabilization of property values, the preservation of the scenic beauty of the County and the needs of the County as a whole and the reasonable needs of particular communities within the County.

Shpak wishes to use the Gattuso property to carry on the business of buying used and wrecked automobiles, scrapping and wrecking such as are beyond repair or not worth repairing, selling used parts therefrom, also selling some new parts, and selling used cars which are, or may be put, in operating

condition. It is proposed to erect a building on the front of the rear part of the property for use in the conduct of the business. It is also planned to keep the used cars which are in operating condition and which may be offered for sale on the front part of the lot, and to store the wrecked cars and others which do not seem worth repairing on the rear portion, that is, in the M-2 area. It is also proposed to leave a fringe of trees along the sides and at the rear of this M-2 area and to erect a fence which (together with the proposed building) would cut off a view of that storage yard from the front along the Washington Boulevard. An architect's rendering of the proposed layout shows about two cars on the used-car lot in front and about two cars in the rear portion of the lot. It is quite impossible from this rendering to see that any of the cars have been damaged in any way. This scene is so charming that it seems that only a churlish neighbor could object to such an industry. However, there are also in evidence some pictures of the operation presently being conducted by Shpak in Baltimore County. The contrast is striking, to say the least.

The general area is described as "mixed." Dorsey Enterprises, Inc. is the owner of a residential tract of about 75 acres, known as Washington Park Manor, which is across the road from the Gattuso property. It also owns Dorsey Speedway, which is located about 3000 feet from the subject property. Washington Park Manor adjoins Meadowridge Memorial Park, which is a large cemetery directly across the road from the Gattuso tract. There is a church in Washington Park Manor and there is another church also on the northwest side of the Washington Boulevard just south of the Dorsey Enterprises' tract. There are also several filling stations and several motels or groups of tourists' cabins in the neighborhood, a trailer park, a building used by the Soil Conservation Service and another by a Farmers Cooperative.

On the southeast side of the Washington Boulevard another church has purchased a rather large area in an M-2 tract which it hopes to develop for its own use. Also on the southeast side of the road is an area of about 530 acres, lying between the Washington Boulevard and the Baltimore &

Ohio Railroad, which a Mr. Kanode and associates either own or control or are seeking to obtain to develop as an industrial and warehousing park area. Besides these there are a number of other buildings and uses of land. Among them are about three used-car dealers, two of whom are said to be illegally engaged in conducting automobile junk yards of the same general type which Shpak wishes to conduct, though they appear to be relatively small operations. There is also a pet cemetery and a tree nursery.

Witnesses who testified at the hearing in the Circuit Court included representatives of Dorsey Enterprises, Meadowridge Memorial Park, all three of the churches and Mr. Kanode and his associates.

It was conceded by Shpak that some burning of wrecked automobiles or parts thereof was necessary to the conduct of the proposed business. The testimony of both Shpak and his son was rather indefinite as to how many automobiles would be on the property at any one time. It appears, however, that the number might run as high as 1000. Shpak claimed that the burning would not have to be done more than perhaps four times a year and professed his willingness to agree to and abide by any conditions which the Board of Zoning Appeals might impose with regard thereto.

The objections to the establishment of the Shpak junk yard were directed primarily at the burning and the consequent smoke and soot and to the unsightliness of the project and its depreciating effect on the value of nearby property. The Meadowridge representative emphasized the unpleasant effect upon funeral parties and others visiting the cemetery, the large investment made in the cemetery and in its beautification and the adverse effect upon sales of lots which the proposed junk yard would have.

The joint opinion filed by the two members of the Board of Zoning Appeals stated as reasons for refusing the application the following: (1) the trend towards cleaning up the Washington Boulevard; (2) the burning of cars, of which as many as 1000 might be on the property at any one time, and the undesirable and uncontrolled smoke which would arise from such burning; (3) that the junk yard would depreciate

property values; and (4) that the Board did not consider a junk yard the most appropriate use of land on a main artery of transportation.

The trial court in an oral opinion rejected the first and fourth grounds mentioned by the Board and took the view that the second and third grounds really came down to only one, that is, an objection to the burning of wrecked cars. This, the trial court thought, could be overcome by the Board's imposing proper safeguarding conditions. Just what those conditions might be or how they would be carried into effect practically is not shown or suggested by the opinion. So far as unsightliness is concerned, this was to be taken care of by the screening and by the proposed fence. The trial court also seems to have been favorably influenced towards Mr. Shpak by the existence of two illegal automobile junk yard operations in the neighborhood. A somewhat similar argument was advanced and rejected in *Park Shopping Center, Inc. v. Lexington Park Theatre Co.,* 216 Md. 271, 139 A. 2d 843. In that case (216 Md. at 276) we quoted this sentence from *Easter v. Mayor & City Council of Baltimore,* 195 Md. 395, 400, 73 A. 2d 491: "Ill-advised or illegal variances do not furnish grounds for a repetition of the wrong." No explanation is offered in the record in this case as to why these allegedly illegal junk yard operations have been permitted to continue. The evidence indicates that there are approximately eleven automobile junk yard operations along a 10-mile stretch of the Washington Boulevard in Howard County. (How many of these may be illegal does not appear.) There would seem to be no need for another.

It is a clearly established rule in the law of zoning that a court may not substitute its judgment for that of the Zoning Board and that the action of the Board is to be sustained if, on the evidence, the matter is fairly debatable. *Oursler v. Board of Zoning Appeals,* 204 Md. 397, 104 A. 2d 568; *Board of Zoning Appeals of Howard County v. Meyer,* 207 Md. 389, 114 A. 2d 626. On the somewhat peculiar state of the record before us, and in the light of that rule, it seems that we are called upon to determine whether or not the testimony

taken in the trial court is sufficient to sustain the Board's conclusion. We conclude that it is.

In addition to the testimony of witnesses called by the opponents as to the damaging effect which the proposed new junk yard would have upon the value of their neighboring properties, there is also the testimony of the real estate expert called by the applicant. His testimony was to the general effect that if the operation proposed by Shpak were conducted in the manner shown by the architect's rendering or reasonably in accordance with that rendering, the proposed operation would not be detrimental to the area and would have no effect whatsoever as far as the values of the adjoining properties were concerned. It is to us unbelievable that the applicant either could or would conduct his junk yard operation in the manner depicted in that rendering or anything closely resembling it. This same expert also testified that an operation such as that then conducted by Shpak in Baltimore County would have an effect on adjoining property and he virtually conceded that the effect on values of such an operation would be adverse.

This case is in some ways similar to *Gilmor v. Mayor and City Council of Baltimore,* 205 Md. 557, 109 A. 2d 739, which involved the erection of a commercial billboard in a residential area. The applicable Baltimore City ordinance was quite similar to the provisions of the Howard County regulations here involved. In the course of its opinion in that case this Court said: "These cases recognize first, the proposition that an applicant for a billboard in a first or second commercial use district, or industrial use district, is entitled to a permit unless the Board finds from the evidence produced before it, or on investigation, that the proposed use would endanger the public health, safety, security or morals; and, second, that the action of the Board, affirmative or negative, is entitled to such respect by the courts, that it will be set aside only if the attacker meets 'the heavy burden of overcoming the presumption of constitutionality of legislative action' by showing that the action of the Board in the exercise of its original jurisdiction was arbitrary, capricious or illegal."

In that case after hearing the evidence and inspecting the

property the Board concluded that no sufficient reason had been shown for denying the permit, and accordingly granted it. This action was affirmed by the Baltimore City Court and by this Court. In the present case the permit sought was denied by the Board. Cf. *Montgomery County v. Merlands Club, Inc.*, 202 Md. 279, 96 A. 2d 261, where there was no evidence to show that the special exception there applied for would involve a use out of harmony with the neighborhood or would depreciate the value of nearby property.

As we have indicated, we think that the evidence was sufficient to make the action of the Board in the instant case at least fairly debatable; hence its action should have been approved and not reversed by the Circuit Court. We shall accordingly reverse the order of the Circuit Court.

This disposition of the matter makes it unnecessary to consider the other point raised in this case, which was, whether or not the trial court properly excluded the testimony of an assistant county health officer to the effect that the proposed use of the property would constitute a health menace. It is also unnecessary to consider the form of the order as to approval by the County Health Officer.

*Order reversed, with costs.*

HENDERSON, J., filed the following dissenting opinion, in which HAMMOND, J., concurred.

I hold no brief for the business of dismantling and disposing of the time-worn and mutilated carcasses of motor vehicles. As the late Judge Dennis once said of the undertaking business, it is a "gloomy but essential trade." Nevertheless, the County Commissioners of Howard County, the legislative body adopting the Zoning Ordinance, has declared that this is a permissible use in an M-2 zone, subject only to the grant of a permit therefor by the Board of Zoning Appeals. The Board has no power to rezone or alter the legislative determination of appropriate uses in general. An applicant is entitled to a permit unless the Board finds that the proposed use would "menace the public health, safety, morals, or general welfare of the community or would prevent the most

appropriate use of land * * *." I think the Board's refusal in the instant case was arbitrary, because based on grounds that would seem to bar such use in any M-2 zone.

In its opinion filed, the Board stated that there was "a definite trend * * * towards cleaning up the entire Washington Boulevard." This is hardly consistent with the fact that both sides of the Boulevard are zoned M-1 to a depth of 300 feet, and on the east side, beyond the 300 feet, the whole area is zoned M-2. The "junk yard" operation proposed is confined wholly to the M-2 zone, and appropriately screened. The Board noted that it would be necessary to burn the wrecked vehicles periodically, and this would cause "undesirable and uncontrolled smoke." If burning is a necessary part of the business, it would seem to be equally true regardless of the location.

We noted in *Feldstein v. Kammauf*, 209 Md. 479, that an automobile junk yard is not a nuisance *per se*. Smoke is a necessary incident of many manufacturing operations. The Board felt that a junk yard would "tend to depreciate the surrounding properties." This, of course, falls short of a determination that it would constitute a menace to the public health or safety, and overlooks the Board's power to impose reasonable safeguards and conditions to protect surrounding properties. The Board said: "We finally feel that to establish a junk yard on one of our main arteries of transportation could not possibly be construed as the most appropriate use of the land involved." Yet the legislative body has decided otherwise, as a general proposition, and there was no testimony as to any more appropriate use of the property in question.

The case of *Gilmor v. Mayor and City Council of Baltimore*, 205 Md. 557, relied on in the majority opinion, does not support the Board's action in the instant case. There, the Board granted a permit for a billboard in a first commercial use district, and we affirmed, despite the contention of nearby property owners that the proposed use would depreciate the value of their properties. We said (p. 565): "The legislative branch of the government in allowing billboards to be erected in such areas, has said, in effect, that

the likelihood that their presence will bring about the dire consequences foreseen by the appellant, is not great enough to forbid generally the use of property to accommodate them. It has added a safeguard for the instances contrary to the general rule in the procedures required * * * whereby the Board, as a legislative agent, may determine in any particular instance that the public health, safety, welfare, security and morals will be adversely affected—not in the deterioration of the neighborhood over a period of time because of the presence of the billboards, but because of some immediate fact, circumstances or condition which would bring about the evils guarded against." See also *Montgomery County v. Merlands Club,* 202 Md. 279, 287. Without laboring the point, I agree with the trial court that the evidence in the instant case fell short of a showing necessary to support the refusal of a permit in the exercise of the police power.

Judge Hammond concurs in the views here expressed.