RENZ ET AL. *v.* BONFIELD HOLDING COMPANY
ET AL.

[No. 148, September Term, 1959.]

36

*Original opinion filed March 15, 1960.*

*Argument ordered on question of imposition of costs March 15, 1960.*

*Opinion on imposition of costs filed May 12, 1960.*

*Concurring and dissenting opinion on imposition of costs filed June 21, 1960.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*John Wesley Smith* (on both arguments) and *Ernest C. Trimble* (on both arguments) for the appellants.

*W. Lee Harrison* (on the first argument) and *Richard C. Murray* (on the second argument), with whom were *Smith & Harrison* on the brief, for the Bonfield Holding Company, one of the appellees.

*Walter R. Haile* (on the second argument), with whom was *Johnson Bowie* on the brief, for the County Board of Appeals, the other appellee.

BRUNE, C. J., delivered the opinion of the Court.

The appellee, Bonfield Holding Company (Bonfield) applied for the zoning reclassification of about seventeen acres of land to the east of the intersection of Loch Raven Boulevard and Hillen Road in the 9th Election District of Baltimore County, just to the north of the Baltimore City Line. The Zoning Commissioner granted the requested reclassification from R-6 (residential—individual or duplex homes on lots of not less than 6,000 square feet) to R-G (residential—group, or row houses). The appellants, residents of the neighborhood, who had protested against the reclassification, appealed to the County Board of Appeals (the Board), and the Board by a 2-1 decision reversed the action of the Zoning Commissioner. Bonfield then sought a review of the Board's action by *certiorari* proceedings in the Circuit Court for Baltimore County,

and the appellants intervened in those proceedings. The Circuit Court, being of the opinion that there had been an error in the original zoning, reversed the Board. The intervenors appealed.

In 1955, the Board of County Commissioners of Baltimore County approved a comprehensive rezoning map for the 9th Election District. In connection with the new map studies were made and a land use map was prepared by the staff of the Planning Commission and this map was considered and approved by that Commission and was transmitted to the Zoning Commissioner. For the tract here in question and for the property to the north of it, the Planning Commission recommended R-6 zoning. After all procedures for the adoption of the map had been complied with, the County Commissioners made a last minute change by which they zoned a part of the land adjoining the subject property on the north as R-A (residential—apartments), because that property had been zoned for apartment use some years previously. Apparently in order to avoid delay, the County Commissioners made this change without referring the map back to the Planning Commission for further comments or suggestions.

The property involved in this case is shaped more or less like a slice of pie. Instead of having a sharp point at its western end, it has a rather rounded frontage of about 315 feet on Hillen Road just south of its junction with Loch Raven Boulevard, a heavily traveled highway. From the northern end of the Hillen Road frontage, the northern boundary runs roughly east-northeast for about 1600 feet. For the first (westerly) 1200 feet or so the adjacent land to the north is zoned R-A; for the balance it is zoned R-6. The easterly boundary extends more or less south for about 910 feet. East of it lie the open so-called Herring Run flood plain and the site of a new County school. Beyond them at a distance 200-400 feet from the subject property is an area now zoned R-G, formerly zoned B-L (a commercial use zoning). The southern boundary of the tract in question, about 1530 feet long, runs along the northern side of Mount Pleasant Park, owned by the City of Baltimore. This end of it is described by the majority opinion of the Board as "a cleared, well maintained

woodland area most pleasant to contemplate." South of the City line and east of the park are many group houses.

Bonfield purchased the property now in question in 1957 with full knowledge of its R-6 zoning. Bonfield's subsequent discovery of the R-A zoning of the adjacent property to the north or northwest inspired the present application for R-G zoning, which applies to all of Bonfield's 18 acres except a strip of about one acre, 150 feet deep along the Hillen Road frontage.

Bonfield's basic contention is that restoration of the R-A zoning of part of the adjoining tract to the north made the 1955 zoning of the Bonfield tract erroneous. It makes two subsidiary contentions, neither of which is of any force. Its claim that it is "hemmed in" by group housing was found "wholly untenable" by the majority of the Board, and we agree. There is much group housing in the general area, but neither the R-6 tract, the Herring Run flood plain (an open space), the County school site, nor the wooded parkland which adjoins the Bonfield tract is a group housing area. The R-G area to the east is on the far side of the flood plain, and its present classification is a recent upgrading from a commercial use zone. The other minor claim of Bonfield is that there has been a change in the character of the neighborhood. The only change shown is that just referred to across the flood plain, which was an upgrading.

Error in the 1955 zoning was the basis of the dissenting opinion in the Board and of the holding of the trial judge in the Circuit Court. The evidence to support it is slim. Mr. Muller, a former County Commissioner, former Zoning Engineer, former Building Engineer, former Zoning Commissioner and former ex officio member of the Planning Board, testifying as an expert (he is also a member of a firm employed to do engineering work for Bonfield), thought that the 1955 zoning was in error as to the Bonfield tract because of the adjacent R-A zoning. He claimed that the logical development for the property is for group housing, and not necessarily for apartments. He thought it a "possibility" that the Planning Board would have changed the classification of the Bonfield tract (to what is not stated) if the then owner

of the property had come before the Board with knowledge that the R-A classification of the property to the north had been put back on the map. He admitted that when that change was made, the Board of County Commissioners (of which he was then a member) had not given any consideration to the adjoining (now Bonfield) property. He thought the R-6 classification in force when he testified was bad zoning because the property was then practically "hemmed in" by multiple houses (a matter which we have already discussed).

Mr. Adams, the Zoning Commissioner, was permitted to testify as an expert. He thought the existing R-6 classification erroneous, but he did not express an opinion as to the correctness or incorrectness of the 1955 zoning. He referred to the same change in conditions which has already been mentioned, but did not seem to recall that was a rezoning up from B-L (commercial). Mr. Lardner, a real estate developer and a representative of Bonfield, thought the 1955 zoning of the Bonfield tract was in error.

Mr. Gavrelis, the Deputy Director of Planning of the County, presented a staff report, which he had prepared, opposing the proposed R-G reclassification. He denied that it had been an error not to classify the property as R-G in 1955. He admitted that he personally would have no objection to an R-A reclassification and that a good case could be made out for showing error in the 1955 zoning because this property was not then classified R-A. He differentiated between R-A and R-G classifications of this property on two bases— one, density of population as affecting overcrowding of schools and overtaxing of roads and of sewer and water facilities, the other compatibility with neighboring zoning. He thought that either the existing R-6 classification or R-A would be compatible with the adjoining R-A area, but that R-G would not be.

Bonfield sought to equate Gavrelis' approval of R-A reclassification with approval of R-G classification because density would not be greatly different as between the two. This, of course, did not dispose of Gavrelis' other ground of differentiation. The two classifications are not the same and the

Baltimore County Zoning Ordinance makes this clear. So does the testimony in this case to the effect that the Bonfield tract, because of its topography, is not well adapted to apartment use.

Nor does the appellees' argument based on density meet another point which was given weight by the Board—that the granting of this reclassification would be the entering wedge for much more R-G reclassification in a considerably larger area. The appellee denied that this would follow, but it was certainly a disputed issue.

The 9th Election Rezoning Map of 1955 was part of a comprehensive plan and the evidence shows that it had been, on the whole, carefully worked out. The last minute change which restored an apartment reclassification previously allowed just north of the Bonfield tract, to some extent varied the R-6 zoning for a fairly large area in this immediate vicinity which had been worked out by the Planning Commission staff, approved by that Commission and approved by the Zoning Commissioner, and recommended by the latter to the County Commissioners. If the last minute restoration of the previous apartment use classification is now to serve as a basis for upsetting the adjacent Bonfield R-6 zoning and replacing it with R-G, the way is paved for pleading changed conditions as the basis for further extentions of R-G reclassification in the larger adjacent area presently zoned as R-6. (No basis at all is shown in this record for saying that the 1955 zoning of this nearby property as R-6 was in error). This would lead to the undermining of zoning in this larger area. Cf. *County Comm'rs of Talbot County v. Troxell,* 214 Md. 135, 132 A. 2d 845. A similar danger has been recognized by this Court with regard to special exceptions in *Easter v. City of Baltimore,* 195 Md. 395, 400-401, 73 A. 2d 491, and in *Marino v. City of Baltimore,* 215 Md. 206, 220, 137 A. 2d 198. See also *Park Shopping Center, Inc. v. Lexington Park Theatre Co.,* 216 Md. 271, 276, 139 A. 2d 843; *Dorsey Enterprises, Inc. v. Shpak,* 219 Md. 16, 23, 147 A. 2d 853. A like problem also arises in connection with spot zoning in its opprobrious sense. As was said in *Cassel v. City of Baltimore,* 195 Md. 348, 355, 73 A. 2d 486: "* * * increase in 'spot zoning' in course of

time would subvert the original soundness of the comprehensive plan and tend to produce conditions almost as chaotic as existed before zoning."

In addition to Mr. Gavrelis' testimony in opposition to an R-G reclassification, there was also testimony by representatives of the County Board of Education, by the Deputy Director of Public Works and by the County Traffic Engineer to the general effect that the granting of an R-G reclassification, would, at least to some degree, aggravate the school, water, sewerage and traffic problems of the neighborhood. The water situation was expected to be relieved in about two years from the time of the hearing (June, 1958) and the sewer facilities were being improved. Some control as to the latter could be effected apart from zoning by refusing to issue building permits. The actual impact of this reclassification on school and traffic problems would apparently not be great. If, however, it led to other similar reclassifications in the area, their combined impact would, of course, be more.

These difficulties would not be eliminated by an R-A classification, which Mr. Gavrelis said that he, personally, would approve. It seems from his cross-examination that density would be nearly the same under R-A or R-G. That, however, was not the question before the Board or the Circuit Court, nor is it the question here. The proposed reclassification is from R-6 to R-G, not from R-A to R-G. Assuming that the density problems arising from a change from R-6 to R-G would be about the same as those arising from a change from R-6 to R-A, the objections as to increased pressure on schools and highways (which currently seems to be greater than that as to sewer or water facilities), still remain as to each, and they are proper subjects for consideration by the Board in a proceeding such as this.

Also, as Mr. Gavrelis' testimony makes clear, the problem of density, with its attendant pressures on school facilities, traffic and utilities, is quite a different problem from compatibility. According to Mr. Gavrelis, an expert planner, R-A and R-6 are compatible, and R-G and R-6 are not. This, he said, is because apartment construction is much more vertical than R-G and hence covers less ground per family

and leaves larger open spaces. Cf. *Montgomery County Council v. Scrimgeour,* 211 Md. 306, 315-316, 127 A. 2d 528, where differences between two commercial classifications were pointed out.

Since R-A and R-G are different classifications, an alleged error in not classifying property as one would seem very weak evidence, if any evidence at all, of error in not classifying it as the other. The requested classification here is, we repeat, from R-6 to R-G. The evidence impresses us as weak to establish any error at all in the comprehensive rezoning, which is what we think the adoption of the 1955 map actually was; but even if there were some substantial evidence of error to support the requested reclassification, we think that the matter was at least debatable. Under such circumstances, the courts are not authorized to overturn the action of the Board and to substitute their judgment for that of the Board. *Oursler v. Board of Zoning Appeals,* 204 Md. 397, 104 A. 2d 568; *Offutt v. Board of Zoning Appeals,* 204 Md. 551, 105 A. 2d 219; *Temmink v. Board of Zoning Appeals,* 205 Md. 489, 496, 109 A. 2d 85; *Board of Zoning Appeals of Howard County v. Meyer,* 207 Md. 389, 114 A. 2d 626; *Kroen v. Board of Zoning Appeals,* 209 Md. 420, 426-7, 121 A. 2d 181; *Mettee v. County Comm'rs of Howard County,* 212 Md. 357, 129 A. 2d 136; *Dorsey Enterprises, Inc. v. Shpak, supra; Quinn v. Tolle,* 217 Md. 643, 143 A. 2d 481; *Muhly v. County Council for Montgomery County,* 218 Md. 543, 147 A. 2d 735; *White v. County Board of Appeals,* 219 Md. 136, 148 A. 2d 420. (This is by no means an exhaustive list of authorities on this point.)

There is no suggestion here that under the 1955 R-6 zoning, the owner is deprived of any reasonable use of the land. In such circumstances the fact that some other classification would make the property more valuable does not require reclassification. *Hewitt v. Baltimore County,* 220 Md. 48, 151 A. 2d 144; *Mettee v. County Comm'rs, supra.* See also *Marino v. City of Baltimore, supra; Walker v. County Comm'rs of Talbot County,* 208 Md. 72, 90-91, 116 A. 2d 393; *American Oil Co. v. Miller,* 204 Md. 32, 42, 102 A. 2d 727; *Easter v. City of Baltimore,* 195 Md. 395, 73 A. 2d 491; *Ellicott v. City of Baltimore,* 180 Md. 176, 23 A. 2d 649.

We accordingly conclude that the order of the Circuit Court must be reversed.

There remains the question of costs in this Court. This question was raised by the appellants during oral argument, but is not raised in their brief, and naturally enough in that situation it is not discussed in the appellee's brief. The appellants ask us to award costs in their favor under Rule 882 a of the Maryland Rules, notwithstanding § 34-7 of the Baltimore County Code (1958), which prohibits an award of costs in this Court except against the appellant on an appeal involving the review of a decision of the Baltimore County Board of Zoning Appeals [now the County Board of Appeals under §§ 601, 602 of the Baltimore County Charter]. The appellants' theory is that Rule 882 a, being later in time than Ch. 634 of the Acts of 1953, supersedes that statute by virtue of Article IV, Sec. 18 A of the State Constitution. No mention has been made of the possible effect of § 604 of the Baltimore County Charter, in conjunction with § 1111 thereof, on what is now § 34-7 of the Baltimore County Code (1958). Cf. *Baltimore County v. Missouri Realty, Inc.*, 219 Md. 155, 159-160, 148 A. 2d 424, and *Southland Hills Improvement Ass'n v. Raine*, 220 Md. 213, 216, 151 A. 2d 734. Because of the lack of full argument on the question of costs, we shall defer decision on that phase of the case pending further hearing.

> *Order reversed; the question of the costs of this appeal to be reserved for further hearing and determination.*

HENDERSON, J., delivered the opinion of the Court as to the imposition of costs.

Prior to 1953, there was no appeal to this Court from a decision of the Circuit Court for Baltimore County in zoning cases. *Johnson v. Board of Zoning Appeals*, 196 Md. 400, 407, 76 A. 2d 736. But by Chapter 634, Acts of 1953, the General Assembly amended the local law, which is the source of zoning power in Baltimore County, *Murray v. Director of*

*Planning,* 217 Md. 381, 385, 143 A. 2d 85, to provide an appeal to this Court "from any decision of the Circuit Court for Baltimore County reviewing a decision of the Board of Zoning Appeals. In such cases the Court of Appeals shall not award costs of the appeal against any party to the appeal except the appellant." Cf. Sec. 467, Chapter 610, Acts of 1955, for a similar provision as to costs in appeals reviewing decisions of the Planning Board. This provision, incorporated in sec. 532 (h) of the Baltimore County Code (1955 ed.), and presently codified as the last paragraph in sec. 34-7 of the Baltimore County Code (1958 ed.), has been cited and applied by this Court in a number of cases, including *Temmink v. Bd. of Zoning Appeals,* 205 Md. 489, 494, 109 A. 2d 85, *Kroen v. Board of Zoning Appeals,* 209 Md. 420, 427, 121 A. 2d 181, and *Missouri Realty, Inc. v. Ramer,* 216 Md. 442, 452, 140 A. 2d 655. In effect, we held in these cases that the local law changed the pre-existing general law on the subject of costs, as set out in Code (1951), Art. 5, secs. 16 and 71, if those sections were applicable at all.

The appellants contend, however, that the provision as to costs incorporated in sec. 34-7 was repealed or superseded by Maryland Rule 882 a, adopted by this Court under the authority of Art. IV, sec. 18, or sec. 18A of the Maryland Constitution. This rule became effective January 1, 1957, and was readopted effective January 1, 1959. The rule reads: "In all cases in this Court the awarding of costs shall be in the discretion of this Court, but unless it is otherwise ordered by this Court costs shall be awarded against the losing party." Rule 2 a states that the rules "shall be interpreted as declaratory of the practice and procedure as it existed prior to their adoption, except insofar as is otherwise expressly provided or they are inconsistent therewith, or as may result from necessary implication." It is well settled, of course, that repeals by implication are not favored, and that local laws are not repealed by general laws, unless such purpose is clearly indicated. *Kirkwood v. Provident Savings Bank,* 205 Md. 48, 55, 106 A. 2d 103. The Editor's note to Maryland Rule 1 e also states: "Apparently it was the intention of the Rules Committee not to adopt local statutes as general rules of the Court

of Appeals even though such statutes were not modified or superseded by the 'Maryland Rules.'." Not only is the question of costs dealt with in a local law, but in a special proceeding, outside the usual scope of proceedings at law or in equity. The general statutory provisions as to costs, contained in Code (1951), Art. 5, secs. 16 and 71, have been expressly repealed by sec. 4, Chapter 399, Acts of 1957. The General Assembly has not attempted to repeal the local law, nor is there any express reference to it in the explanatory notes to the rules. We find no such necessary implication in the generality of Rule 882 a as to repeal the local law.

This Court on other occasions has declined to give general language in our rules the effect of repealing special exceptions or changing the practice existing prior to the adoption of the rules. See *Grant v. Curtin*, 194 Md. 363, 368, 71 A. 2d 304, and *Robertson v. Dorsey*, 195 Md. 271, 274, 73 A. 2d 503, dealing, respectively, with the time allowed for appeals from "determinations" on a trial of issues from the Orphans' Court, and appeals in *mandamus* cases. See also *Edwardsen v. State*, 220 Md. 82, 88, 151 A. 2d 132. In *State Roads Commission v. Lassiter*, 196 Md. 552, 77 A. 2d 16, we held that the rule fixing the time of appeal, in general terms, did not repeal the statutory provision fixing a shorter time in condemnation cases. We said (p. 554): "Since the power to deal with the subject matter is presumably shared with the legislature, it is peculiarly appropriate that changes in this field should not be left to implication." We think these cases are persuasive, if not controlling. Since we reach this result as a matter of construction, it is unnecessary to discuss the appellees' contention that this Court was powerless to change the statutory rule as to costs, on the ground that the very right to appeal was conditioned upon the payment of costs by the appellants, win or lose, and hence beyond the scope of the rule-making power.

The appellants contend, however, that the provisions of Chapter 634, Acts of 1953, dealing with costs, were repealed by the adoption of the Charter, under Art. XI-A of the Maryland Constitution, on December 6, 1956. In *Baltimore County v. Mo. Realty*, 219 Md. 155, 160, 148 A. 2d 424, we found

it unnecessary to decide whether the provisions of the local law or the Charter were applicable in a case involving the finality of an order of the Board of Zoning Appeals, because the same result would follow under either. In *Southland Hills Improvement Ass'n v. Raine*, 220 Md. 213, 216, 151 A. 2d 734, we likewise found it unnecessary to decide whether the provisions of sec. 604 of the Charter repealed the pre-existing local law as to standing to appeal by a taxpayer. The argument in the instant case seems to be that since sec. 604 of the Charter provides for an appeal to the Court of Appeals from a decision of the circuit court in zoning matters, although there is no reference to costs in that section, there was an implied repeal of the pre-existing local law on the subject. The argument is buttressed by the contention that the right of appeal no longer stems from local law, but is derived from the Charter and the Express Powers Act, Code (1957), Art. 25A, sec. 5 (U). Section 604 of the Charter used the identical language of this subsection. Chapter 399, Acts of 1957, eliminated a provision in subsection (U) limiting the time of taking an appeal. Section 4 of Art. XI-A of the Constitution provides that after the adoption of a charter, no public local law shall be enacted by the General Assembly on any subject covered by the Express Powers Act.

If we assume, without deciding, that all zoning powers in Baltimore County are now derived from the Charter, it does not follow that the mere adoption of the Charter containing in sec. 604 the language of sec. 5 (U) of the Express Powers Act, operated to repeal the local law as to costs. Section 1111 of the Charter provides: "The public local laws of Baltimore County and all rules, regulations, resolutions and ordinances of the county commissioners in force at the time of the effective date of this Charter are hereby repealed to the extent that they are inconsistent with the provisions of this Charter, but no further; and to the extent that they are not hereby repealed because of such inconsistency, all such public local laws, rules, regulations, resolutions and ordinances shall continue in full force and effect until repealed or amended * * *." Even if we assume, without deciding, that the Council lacked the power to enact local laws relating to

48

zoning, prior to the addition of sec. 5 (X) to the Express Powers Act, by Chapter 614, Acts of 1959, cf. *Ames v. Board of Supervisors of Elections,* 195 Md. 543, 551, 74 A. 2d 29, a local law, not enacted by the Council but by the General Assembly, may continue in effect after the adoption of a charter, if not inconsistent therewith. See *Bratburd v. State,* 200 Md. 96, 102, 88 A. 2d 446, where it was held that a local gambling law, imposing a greater penalty than the Council could impose under the Express Powers Act, continued in force after the adoption of the Charter for Montgomery County.

We find no evidence that the voters who adopted the Charter or the Council intended to repeal the local law. The Reporter's notes to sec. 604 state that "the Charter Board considered it desirable, if not essential, to conform closely with this statutory language [Article 25A, sec. 5 (U)]." Sec. 604 was included in the 1958 Code, adopted by the Council on December 23, 1958. An explanatory note states that some portions of the Code of 1955 were omitted as "obviously in direct conflict with the Charter provisions or as being obsolete. Whenever there was doubt as to whether a particular portion was still effective, it was retained in this Code." The fact of its inclusion would seem to indicate, not an intention to repeal, but an intention to continue, if possible. The point is, we think, that there is no necessary inconsistency. Mere silence does not create one. The local law and the Charter are not so repugnant that they cannot stand together. Cf. *Pressman v. Elgin,* 187 Md. 446, 450, 50 A. 2d 560.

*Costs to be paid by the appellants.*

BRUNE, C. J., concurring in part and dissenting in part as to the imposition of costs:

I concur in the holding of the majority opinion that our general rule relating to costs (Maryland Rules, Rule 882 a) did not supersede the provisions of Ch. 634 of the Acts of 1953 (now codified as Sec. 34-7 of the Baltimore County Code) relating to costs on appeal to this Court. I do not agree, however, as to the effect of the Baltimore County

Charter. The new provisions which it introduced with regard to appeals in zoning cases (Sec. 604), which apply both to appeals to the Circuit Court and to appeals to this Court, seem to me to have superseded fully the provisions of Ch. 634 relating to appeals, including those pertaining to costs. Sec. 604 concludes with the sentence: "The review proceedings provided by this section shall be exclusive." That, I should think, would cover the matter entirely. It seems quite evident both from the text and from the Reporter's Notes to the Charter that it was intended to bring Sec. 604 into full accord with Code (1951), Art. 25A, § 5V, as amended by Ch. 199 of the Acts of 1953. This amendment substituted appeals to the Court of Appeals in zoning cases for possible review on certiorari in certain cases theretofore available. It made no specific provision as to costs, thereby, I think, placing them on the same basis as costs on other appeals generally. Sec. 5V as amended in 1953 (Sec. 5U of Art. 25A of the 1957 Code) concludes exactly as does Sec. 604 of the Baltimore County Charter with regard to the exclusiveness of the review thereby afforded, except that it uses the word "subsection" instead of "section."