THE GEORGE F. BECKER COMPANY *v.* JERNS ET UX.

[No. 93, September Term, 1962.]

*Decided February 6, 1963.*

The cause was argued before HENDERSON, HAMMOND, PRES-COTT, HORNEY and MARBURY, JJ.

*T. Hunt Mayfield,* for appellant.

*John L. Clark,* for appellees.

HORNEY, J., delivered the opinion of the Court.

This proceeding for declaratory and injunctive relief was brought to test the validity of the rezoning of a tract of land in Howard County from R-20 (residential) zoning to M-2 (industrial) zoning.

The question on appeal is whether the Board of County Commissioners (board) acted in conformity with law when it undertook to incorporate the residentially zoned tract it had previously reclassified (despite the challenge of the reclassification in a pending judicial proceeding) into a subsequently adopted comprehensive rezoning plan and map as an industrial zone. The chancellor declared the action of the board null and void. We agree.

The tract in question—described as a 19-acre piece of wooded and unimproved land with a rough topography in an area that is zoned residential around the whole of its perimeter other than a distance of about 900 feet along the right of way of the Baltimore and Ohio Railroad—is the undeveloped portion of the "Florey Subdivision" located at the end of a narrow semi-

private road or lane, known as Florey Road, leading from Hanover Road into and through the developed portion of the subdivision.

Within the perimetric residential area there are about forty dwellings ranging in value from $12000 to $25000, and with one insignificant exception—a reclassification to permit the use of a basement in a dwelling as a grocery store—the entire area is used only for residential purposes. But on the other side of the railroad tracts, the area is classified heavy industrial (M-2) and is used for a number of industrial purposes. Immediately opposite the subject property there is a cement products plant and a garage.

After the contract purchaser (George F. Becker Company) applied for reclassification of the property from a residential to an industrial use, a hearing was held before the board in December of 1958, and a group of residents in the surrounding area appeared to protest the reclassification. Six months later, in June of 1959, the board, despite the recommendation of the planning commission to the contrary, granted reclassification and assigned as reasons therefor: that the industrial use of the area across the railroad tracks made "the property unsuitable for residential use"; that there was a "need for industrial property adjacent to a railroad" where a siding could be located; that the property was so situated that "the industrial use" thereof would "not adversely affect the surrounding area"; and that the rezoning was a "logical and practical extension" of an existing industrial use on the other side of the tracks.

The protestants promptly filed a bill in equity attacking the validity of the action of the board on the theory that it was arbitrary and created spot-zoning in a wholly residential use zone for the special benefit of the contract purchaser. But, probably because a prompt hearing was not demanded by either side, the proceeding remained dormant for more than a year.

Meanwhile, the planning commission, which had been working on the proposed revision of the general plan of county zoning, prepared a new general plan or map and submitted it to the board in July of 1960 for adoption. Therein, the commission, despite the previous decision of the board, recommended

(as it had done in 1958) that the original residential class-
ification of the property in question be retained. But, after a
number of hearings at which, according to the official exhibits
in the record, no change was contemplated, the board, in adopt-
ing the new plan as the official zoning map of the county, spec-
ified that the new plan and map should be so revised as to
show that the property in question had been rezoned industrial
without stating at that time the reason for its action. After the
board had reaffirmed or reinstated the industrial reclassifica-
tion it had previously granted, the planning commission re-
vised the new zoning map showing the change in zoning that
had been ordered by the board. While the record is scant, it
appears from what is printed in the appendix to the appellant's
brief that the board, having made up its mind as to what was
proper zoning for the property two years before, never aban-
doned the opinion then expressed, and based its decision to re-
vise the comprehensive rezoning map solely on conditions that
had existed "back in 1959" without considering any further
evidence because (as the president of the board testified) such
conditions had not "changed at all." The protestants, who were
surprised when they subsequently learned that a change of zon-
ing had been ordered, sought and were granted leave to fur-
ther amend the once-amended bill of complaint so as to also at-
tack the reclassification on the theory that the alleged unor-
thodox action of the board was invalid.

Other than what may be inferred from the reasons assigned
by the board for granting the reclassification in June of 1959,
there is nothing in the record before us to indicate the nature
and character of the evidence presented at the hearing before
the board on the initial application for reclassification. Nor does
the record contain all of the evidence produced at the hearing
before the chancellor on behalf of the contract purchaser as is
material to the question to be decided on appeal.

Although the evidence given by the expert and only witness
on behalf of the contract purchaser was not included in the ap-
pendix, we are informed by the opinion of the chancellor that
he testified in court to the effect that extension of the exist-
ing industrial use from across the railroad tracks into the resi-
dentially zoned area was logical and justifiable and that the to-

pography of the property was such as to make it unavailable and unsuitable for residential use. But so far as the record shows there was no proof of a basic mistake in the original zoning or a substantial change in the character of the neighborhood. Instead it appears, as the chancellor pointed out, and the state of the record confirms, that the contract purchaser based its defense primarily on the presumption that the action of the board was reasonable and therefore valid. On the other hand, as appears from the appendix to the appellees' brief, an expert and some of the protestants testified (and gave reasons therefor) that the industrial use if permitted would adversely affect the entire surrounding areas; that the railroad right-of-way is a "logical boundary" or dividing line between the differently zoned areas on opposite sides of the railroad tracks; that the use of the narrow semipublic road for commercial traffic would inevitably cause noise and dust and create a dangerous circumstance to children at play; that, in their opinion, the proposed industrial intrusion cannot be justified as part of a comprehensive plan; and that the reclassification would effect an opening wedge which would eventually destroy the adjacent residential community.

The first point to be decided concerns the propriety of the action of the board in rezoning the subject property from residential to an industrial use. As to this, the obvious test to be applied is whether the action of the board was arbitrary and unreasonable under the circumstances. We think it was.

It is true, of course, that the adoption of a new zoning plan and map would ordinarily constitute a comprehensive rezoning which is entitled to the same presumption of correctness as the original zoning. *McBee v. Baltimore County,* 221 Md. 312, 157 A. 2d 258 (1960); *Trustees (of McDonogh) v. Baltimore County,* 221 Md. 550, 158 A. 2d 637 (1960); *Town of Somerset v. (Montgomery) County,* 229 Md. 42, 181 A. 2d 671 (1962). But that does not necessarily mean that all parts of a comprehensive rezoning are valid in every case, for here we think it is clear that the rezoning under attack should not have been a part of the new plan.

In the first place, since the board was exercising the delegated legislative power it had to zone, it was bound to act in

accordance with a comprehensive plan, for any departure from a comprehensive plan may, as was said in *Hewitt v. Baltimore County,* 220 Md. 48, 63, 64, 151 A. 2d 144 (1959), "involve both exceeding the power which has been delegated and discrimination which is violative of constitutional requirements." In this case, as in *Hewitt,* it appears that the action of the board in classifying the property in question as industrial was "an arbitrary and unreasonable devotion of a small area to a use inconsistent with the uses to which the rest of the district is restricted, made for the sole benefit of the private interests of the owner and not in accordance with a comprehensive plan." Furthermore, there is a natural barrier between the differently zoned areas; the railroad right-of-way (rather than the expressway as in *Hewitt*) constitutes a "logical boundary" or dividing line between the industrial zone and the residential zone. It would seem therefore that the classification of the property in question as industrial is irreconcilable with a comprehensive plan.

Other than what has been said, it should not be overlooked that, under the peculiar circumstances in this case, the subsequent action of the board in adopting the comprehensive rezoning map—on which the classification of the subject property as industrial had been substituted for the original residential zoning—was in fact no more than a reaffirmation, under the guise of comprehensive rezoning, of a challenged reclassification that had not been heard and disposed of by the courts. Since the comprehensive rezoning in 1961 was subsequently admitted by the board to have been based solely on the reclassification of 1959, it is clear that the validity of the change in zoning should be viewed, not in the light of subsequent events, but in the light of conditions when the reclassification was made. Cf. *Trustees (of McDonogh) v. Baltimore County, supra.* This is what we shall do.

The remaining question is whether the reclassification of 1959 was valid or invalid, and it poses no difficulty.

It is not the function of the courts to zone or rezone but only to determine whether the legislative body has properly applied the law to the facts. Nevertheless, when there is no basis for reasonable debate or there are no supporting facts in the rec-

ord, it is proper for the court to declare a reclassification or rezoning to be arbitrary, whimsical, discriminatory or illegal. *Reese v. Mandel,* 224 Md. 121, 167 A. 2d 111 (1961) ; *Baltimore v. N. A. A. C. P.,* 221 Md. 329, 157 A. 2d 433 (1960) ; *Dorsey Enterprises v. Shpak,* 219 Md. 16, 147 A. 2d 853 (1959) ; *Eckes v. Board of Zoning Appeals,* 209 Md. 432, 121 A. 2d 249 (1956).

When the record, as is the case here, is devoid of any supporting evidence (other than the conclusions of the board which were without probative value), there is no question to debate. There was no showing here of a basic mistake in the original zoning or a substantial change in the character of the neighborhood. *Baltimore v. N. A. A. C. P., supra; Zang & Sons, Builders, Inc. v. Taylor,* 203 Md. 628, 102 A. 2d 723 (1954). See also *American Oil Co. v. Miller,* 204 Md. 32, 102 A. 2d 727 (1954). And see 1 Rathkopf, *The Law of Zoning and Planning* (3d ed. 1956), 27-14 to 27-18, for an excellent treatise on the prerequisites of reclassification and the presumption with respect to reasonableness and constitutionality thereof under the so-called "Maryland" rule.

The chancellor properly declared that the action of the board was invalid.

*Decree affirmed; appellant to pay the costs.*