## ZONING BOARD OF HOWARD COUNTY, ET AL. *v.* KANODE

[No. 419, September Term, 1969.]

*Decided July 7, 1970.*

The cause was argued before HAMMOND, C. J., and

BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Orrin J. Brown, III,* with whom were *Thomas E. Lloyd* and *Charles E. Hogg* on the brief, for appellants.

*Preston A. Pairo, Jr.,* with whom was *J. Patrick Coyne, Jr.,* on the brief, for appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

The zoning pains of Howard County have often required our attention during the past decade.[1] Although the instant case is scarcely more than a twinge it must nevertheless be dealt with. The Planning Board recommended denial of the petition for reclassification. The Zoning Board, after a hearing, denied the petition. The circuit court reversed the Zoning Board. We shall reverse the decision of the circuit court.

The tract of land with a part of which we shall be concerned adjoins the town of Elkridge. It consists of 36 acres fronting 616 feet on the south side of Old Washington Boulevard (Md. Rte. 447) and extending in a generally southerly direction a half mile or so to the Baltimore & Ohio Railroad, upon which it bounds for a distance of 1,300 feet. Augustine Avenue extends south from Old Washington Boulevard along the western boundary for about 1,000 feet. From elevation 138 (feet above sea level) at Old Washington Boulevard the ground drops to elevation 114 in the first 150 feet and then rises gradually to elevation 198 in the next 1,200 feet. Continuing

---

1. *E. g., Arundel Corp. v. Board of Zoning Appeals,* 255 Md. 78 (1969); *Bowie v. Board of County Comm'rs,* 253 Md. 602 (1969); *Haldemann v. Board of County Comm'rs,* 253 Md. 298 (1969); *Chatham Corp. v. Beltram,* 252 Md. 578 (1969); *Smith v. Board of County Comm'rs,* 252 Md. 280 (1969); *Board of County Comm'rs v. Tipton,* 244 Md. 77 (1966); *Chatham Corp. v. Beltram,* 243 Md. 138 (1966); *Mandel v. Board of County Comm'rs,* 238 Md. 208 (1965); *George F. Becker Co. v. Jerns,* 230 Md. 541 (1963); *Phillips v. Zoning Commissioner,* 225 Md. 102 (1961); *Krieger v. Planning Commission,* 224 Md. 320 (1961); *Kreatchman v. Ramsburg,* 224 Md. 209 (1961).

in a southerly direction it runs gradually downhill to the railroad's right of way to elevation 60 at the southeast corner and elevation 75 at the southwest corner, which is crossed by a 150 foot electric transmission line right of way.

In 1957 Charles Shaab, who at that time owned the tract, sought, unsuccessfully, to have it, or some part of it, reclassified from a residential use to a commercial use. John Hirsch acquired it from Shaab in February 1962. Three months later the petition of Arthur McGinnis (apparently Hirsch's purchaser under a contingent contract) to have the tract reclassified from R-20 (Residential, one and two family detached) to R-A-1 (garden apartments) was denied. In January 1964, upon the petition of the Howard County Planning Commission, the tract was reclassified from R-20 to R-12 (Residential, one family semi-detached). In 1966 Hirsch sold it to Allan Berman whose petition for reclassification from R-12 to R-A-1, following disapproval by the Planning Commission, was denied by the Board of County Commissioners on 27 September 1966. On 20 November 1967 Berman sold the tract to Area Realty, Inc., for $150,000.

We note that the president and ostensible owner of Area Realty, Inc., is Bernard F. Goldberg, Esq., a member of the Maryland bar, whose office is in Howard County. He was the attorney of record for Allan Berman in the matter of the 1966 petition for reclassification. Mr. Goldberg was familiar with the tract and he was "perfectly aware" of the fact that its zoning classification was R-12. Richard Smith, the assistant project engineer for Matz, Childs & Associates, civil engineers, testified he had been associated with the tract "since about the middle of 1967 when Mr. Goldberg brought the property to us and asked us because of our previous familiarity with the site to proceed with a schematic diagram for an R-12 layout. * * * In the meantime [between the middle of 1967 and 9 November 1967] Mr. Goldberg advised us to go ahead since he was purchasing the property to proceed with a boundary survey and also with the topo-

graphic survey * * *." Upon the completion, in March 1968, of the topographic survey and after further study Smith said they advised Mr. Goldberg that "the plan was not reasonable to be developed as an R-12 subdivision." They concluded that "the site would be best developed as R-A."

Mr. Goldberg said he tried, without success, "to sell it [the tract] one way or the other" to various individuals and organizations. He did not say upon what terms. In the fall of 1968 he was able to arouse some interest on the part of Robert Kanode, a local contractor. Before they could come to an agreement, however, the voters had adopted a new charter for Howard County. One of the side effects of the election of 5 November 1968 was the prohibition of final action on any zoning until 28 January 1969, the effective date of the new government. *Bowie v. Board of County Comm'rs*, 253 Md. 602, 615 (1969). Eventually Kanode agreed to buy the back 26 acres of the tract (which we shall now call "the property") subject to its being reclassified from R-12 to R-A-1. He (Kanode) testified it would not be "practical or economical" to attempt an R-12 development of the property. He conceded, however, that he had "done a real good job" in another development where the topography was not much different. While it is not altogether clear from the record it is our understanding that Area Realty, Inc., has retained the 10 acre portion fronting on Old Washington Boulevard and that it is content for it to remain in the R-12 classification.

Kanode's petition, filed not long after the new government assumed office, was considered by the new Howard County Planning Board on 21 May 1969. The Board found, in substance, as follows:

1. The proposal is not in accordance with the General Plan adopted 20 July 1960.
2. Public water is available.
3. The existing sewer in Augustine Avenue cannot be utilized. The system to be constructed would have to be connected to the "Deep Run Interceptor" (south of the B & O Railroad).

4. A new school unit would be required.
5. R-A-1 zoning would require two more classrooms than R-12.
6. "Zoning Case No. 453 granted on December 27, 1966, includes 57.25 acres of R-A-1 which has not been developed as of this date. This area is located north of Harwood Park and is within a 1½ mile radius from the subject property. The 57.25 acres could accommodate 855 apartment units."
7. "The General Plan for Howard County proposed nine separate apartment areas totaling over 800 acres to be used for apartment development. These planned apartment sections were designed in clusters near shopping and commercial centers where transportation facilities and other public services are or will be provided. The subject property is some distance from commercial services."
8. "Less than a mile from the subject property, on U.S. Route One at Montgomery Road, are approximately 94 acres of land designated for apartment development in the General Plan which are still undeveloped. The designated 94 acres are capable of accommodating about 1420 apartment units in accordance with the Zoning Regulations of Howard County. Six (6) of the 94 acres are presently zoned (BCC Case 415) in the R-A-1 District and are undeveloped. In comparison, the applicant's request could create an additional 390 apartment units."

9. Dangerous traffic conditions would ensue.

The Planning Board's conclusions, in substance, are as follows:

1. "[A] very definite traffic problem" would be created.
2. There is no need for apartments in the area.

3. "There are 525 acres of land zoned R-A-1 in the County at present with only about 59 acres either developed or under development for apartment use. This amount does not include the 1,369 acres of apartment land in Columbia (New Town District)."

4. "The subject property could be developed under the present R-12 Zoning since subdivisions, such as Elk Heights with even steeper topographic conditions, (Elkridge Heights) were developed successfully in the area."

5. "The petitioner contends that there have been numerous changes in the complete Route One corridor since the adoption of the Zoning Map on May 16, 1961, and this contention is correct. However, these changes are not in the immediate vicinity and neighborhood of the subject property which vicinity has been quite stable as a single family area for many years."

6. "Therefore, it is the belief of the Planning Board that the proposed rezoning of the subject property is not consistent with the 1960 General Plan and the 1961 Official Zoning Map and would not be in the best interest of the surrounding neighborhood. Furthermore, the Planning Board sees no indication of a mistake in the General Plan and believes that the need for additional R-A-1 Zoning has not been shown."

The hearing took place before the new Zoning Board on 3 June 1969 at 7:00 P.M. Much of the testimony there produced has already been discussed. C. Howard Bockover's qualifications as an appraiser of real estate were conceded. He testified at length in respect of mistakes in the General Plan. His general conclusion was that "the highest and best use of * * * [the property] is R-A-1 zoning" and that "it would be physically impossible to

develop it as R-12 zoning." Six residents voiced objections to the proposed reclassification. Another lady said she was "a senior citizen" and that she "might want to live in one of those apartments." "Anyway," she said, "I'm for the apartments, I think."

On 30 June the Zoning Board announced its decision which, in part, is as follows:

"Petitioner contended that it was a mistake to zone the property R-12 because its topography is so harsh that it cannot be developed in accordance with R-12 regulations. He presented evidence to show that subdivision streets could not be built, even with extensive grading, to meet the maximum grade allowed in the Road Specifications. If enough earth were moved to allow streets to be built properly, even if that were economically feasible, it would destroy the esthetic value of the site. He further contended that substantial changes had occurred in the vicinity of the neighborhood since the adoption of the comprehensive Zoning Map in 1961, that the proposed R-A-1 development was in harmony with the general development of the area, and that if the property were developed, in apartment use, it would not adversely affect the surrounding and vicinal properties. An expert traffic engineer testified that the present road network could safely handle any additional traffic resulting from apartment development.

"Protestants, adjacent landowners and residents of the immediate neighborhood, testified that if the rezoning were granted and the property were developed, it would adversely affect their homes by increasing traffic and congestion in the streets, by overloading the local schools, and by changing the character of the neighborhood from owner-occupied single family residences to apartments. Protestants presented pe-

titions with over 200 signatures objecting to the reclassification.

"Considering all the evidence adduced at the hearing, *as well as the report of the Planning Board recommending a denial,* we make the following findings:

"1. That, considering the topography of the site, a different zoning classification may have been more suitable than R-12, but the evidence of mistake is insufficient to grant a reclassification.

"2. That there have occurred no substantial changes in the character of the surrounding neighborhood since the adoption of the comprehensive Zoning Map." (Emphasis added.)

Pursuant to the provisions of the ordinance enacted 12 March 1969 (Sec. 16.207, Howard County Zoning Regulations) Kanode filed his "Petition of Appeal" on 25 July 1969. He claimed the decision of the Zoning Board denied him "all reasonable use of his property," that it was "so grossly erroneous * * * as to imply bad faith," that it was arbitrary, capricious "and based solely on a plebiscite." His principal claim was that the decision, in effect, "confiscated" his property without compensation.

The learned trial judge seems to have relied, mistakenly we think, upon our decision in *Bonnie View Club v. Glass,* 242 Md. 46 (1966). In his opinion Judge Mayfield referred to testimony, in the case at bar, that when the tract was placed in the R-12 classification in 1964 the only topographical information then available to the planning and zoning authorities was that contained in the Coast and Geodetic survey maps and that it was not until the Matz, Childs topographical survey had been completed and made available to the authorities could they have known that the property "could not be devoted to any of the uses permitted by the R-12 zoning regulations." In concluding that the R-12 classification was a mistake he analogized it with the situation which was

presented in *Bonnie View*. There, as narrated by Judge
Prescott (later Chief Judge), who spoke for the Court,
"it was discovered that extensive copper-mine operations
had been undertaken on the property in the latter half
of the last century, which were renewed for a short pe-
riod during World War I. Those mining operations in-
volved the construction of a number of mining shafts
* * * some ranging to 600 and 700 feet deep. There are
at least 7 horizontal levels, in addition to the main shaft
which tend to negate the feasibility of construction of any
kind above them." *Id.* at 48, 49. Judge Mayfield went on
to say:

> "In affirming the lower Court, which had af-
> firmed the Board's action, the Court of Appeals
> said:
>
>> 'The extraordinary situation existing in 1957
>> (the time of comprehensive zoning or rezon-
>> ing) caused by the generally unknown mine
>> shafts and subsurface rock formations, when
>> coupled with the topography making the prop-
>> erty unusually unfit for single-family residen-
>> tial development, render that conclusion such
>> that reasoning minds could reasonably have
>> reached the result the agency reached upon a
>> fair consideration of the fact picture painted
>> by the entire record. *Board v. Oak Hill
>> Farms*, 232 Md. 274. When this occurs, our
>> only course is to affirm. Cf. *A. W. Dill, et al.
>> v. The Jobar Corporation*, 242 Md. 16.' [*Id.* at
>> 52-53.]
>
> "The Court noted that the Board concluded there
> was error in the original zoning
>
>> ' "probably because at the time of the adop-
>> tion of the map no one brought to the atten-
>> tion of the authorities the physical [mine
>> shafts] and topographical factors involved,
>> nor the uses of the surrounding properties".'
>> [*Id.* at 52.]"

It seems to us that Judge Mayfield has overlooked the fact that the posture of *Bonnie View,* as it came to us, was significantly different from that of the case at bar. There the Baltimore County Zoning Commissioner approved the petition for reclassification and the Board of Appeals granted it. The circuit court *affirmed* the decision of the Board of Appeals. In affirming the action of the circuit court Judge Prescott did indeed apply the familiar principle (quoted by Judge Mayfield) that "reasoning minds could reasonably have reached the result" reached by the Board of Appeals. But that same principle is applicable here. The Zoning Board had before it not only the testimony of the witnesses and the exhibits of the petitioner but also the report of the Planning Board which, it will be observed, was not a report dealing "largely in abstractions without meaningful specifics," as was the one in *Board of County Comm'rs v. Oak Hill Farms,* 232 Md. 274, 284 (1963), nor the kind of "tinkling cymbal" we found to be without significance in *Habliston v. City of Salisbury,* 258 Md. 350 (1970). As we said in *Board of County Comm'rs v. Turf Valley Associates,* 247 Md. 556, 562 (1967), also an appeal from a decision of Judge Mayfield, "the Board had before it the report of the Planning Council and the reasons therein given for denying the application. That report of itself, constituted probative evidence for the denial of the petition" thereby making the issue fairly debatable. Thus it is clear, in the case at bar, that the record before the Zoning Board was sufficiently substantial to support equally permissible inferences and we have laid it down quite firmly that the trial court may not "choose between [those] equally permissible inferences * * * because to do so would be exercising a non-judicial role." *Board of County Comm'rs v. Oak Hill Farms, supra* at 283. In these circumstances that is the business of the Zoning Board.

While the confiscation issue may have been lurking in the shadows during the hearing before the Zoning Board it seems not to have emerged therefrom until argument

before the circuit court. Indeed the word "confiscation" was never mentioned at the Board level. Mr. Goldberg was told the R-12 subdivision "was not reasonable" and that "the site would be best developed as R-A." Kanode was not interested because he thought an R-12 development was "just not practical in today's market." He agreed, however, that nearby tracts with similar "difficult topographical problems" had been developed in lots containing "between 28,000 and 29,000 square feet." The Planning Board's conclusion No. 4 puts it in a somewhat different light, pointing out that other subdivisions "such as Elk Heights with even steeper topographic conditions were developed successfully * * *." It is quite likely true that festooning the property with garden apartments will generate more dollars for Messrs. Goldberg and Kanode than any use compatible with the R-12 classification but to repeat what we said on another occasion, "[i]t is well settled that the purpose of the rezoning authority * * * is not to guarantee the purchaser of a piece of property a use that will justify his investment." *Montgomery County Council v. Kacur,* 253 Md. 220, 231 (1961). We have not found in this record uncontroverted evidence sufficient to support the conclusion that the retention of the R-12 classification deprives the owner of *all* reasonable use of the property. The issue is fairly debatable. *Montgomery County v. Laughlin,* 255 Md. 724 (1969) ; *Montgomery County Council v. Kacur, supra; Tauber v. Montgomery County Council,* 244 Md. 332 (1966) ; *Mayor and City Council of Baltimore v. Borinsky,* 239 Md. 611 (1965).

> *Order of 9 January 1970 reversed and the Zoning Board's order of 30 June 1969 reinstated. Appellee to pay the costs.*