## THE CHATHAM CORPORATION *v.* BELTRAM

[No. 33-Adv. September Term, 1966.]

*Decided June 20, 1966.*

The cause was argued before PRESCOTT, C. J., and HAM--
MOND, MARBURY, OPPENHEIMER and BARNES, JJ.

*Cornelius F. Sybert, Jr.,* with whom were *C. Ferdinand Sy-
bert* and *Sybert & Sybert* on the brief, for appellant.

*James S. Ansell* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court. PRESCOTT,
C. J., dissents.

In another of a series of efforts to have a large tract of land
owned by it in Howard County rezoned to a higher residential
density, the appellant asks us to reverse the action of Chief
Judge Macgill by which he decreed that the action of the County
Commissioners in granting, in large part, the requested rezon-
ing was arbitrary and capricious and hence invalid in that it
represented a mere change of mind from contrary action of the
Commissioners a few months before, without change in con-
ditions or in the character of the neighborhood in the interval.

The appellant does not in its brief make a direct or frontal
attack on Judge Macgill's holding, rather it claims prejudicial
error in his rulings on procedural and peripheral phases of the
matter, such as his ruling that the appellee, a protestant before
the Commissioners, had standing to bring the suit challenging
the Commissioners' action, his allowing the amended bill of
complaint to be filed a day after the day last set in his order
for the filing of an amended bill, his basic assumption that the
change or error rule applied instead of the floating zone rule
and, finally, his holding that there had been presented no evi-
dence of change to support the Commissioners' action.

On December 3, 1964, the Chatham Corporation acquired
some ninety-nine acres of land in Howard County, 1400 feet
north of U. S. Route 40 and 200 feet west of St. John's Lane,

and eight days later applied for an amendment of the zoning map to reclassify the property from R-20 (one and two family detached dwellings on a lot of at least 20,000 square feet) to R-12 (one family semi-detached dwellings on a lot of 20,000 square feet unless both public water and public sewer are provided, when the lot can be only 12,000 square feet).

A hearing was held on January 28, 1965. The testimony showed that the property which was largely surrounded by residential developments of R-20 lots was to be used to extend an adjacent development, also of R-20 lots, known as Section One of Chatham, which had been started in July 1964. To the south were twelve acres owned by a Roman Catholic Church on which was being built a complex of buildings, including a parochial school. To the southeast was an area zoned for a shopping center and an area zoned for garden apartments. A tract of six acres of the ninety-nine acres was to be dedicated, with land of other owners, for a park. The six acres were to remain R-20, and another section in the northwestern part of the ninety-nine acres was to be developed in actuality as R-20 because of the road pattern of that area.

The president and owner of the Chatham Corporation said that twelve houses had been built and sold in Section One of the development, that an agreement had been signed with the Metropolitan Commission and a deposit of $120,000 made to insure the construction of sewerage facilities in the area and similar arrangements were being made for water lines which already were installed in the existing part of the Chatham development. There was to be no actual development until sewerage and water in fact were installed. If the R-12 zoning were granted, the Chatham Corporation intended to have an average lot of between 13,000 and 14,000 square feet which would allow some 220 lots in all, while the present zoning would permit only 165 to 170 lots and it would be "economically less advantageous" to develop the ninety-nine acres as R-20 than as R-12.

A real estate expert testified that two acres along the north side of Route 40 had been rezoned for a shopping center and garden apartments, respectively, and that twelve acres had been sold to St. Paul's Roman Catholic Church for a church and a church school since the zoning map had been adopted in 1961,

and that water and sewerage would be soon available. These he felt were changes in the character of the neighborhood which would justify the requested rezoning. In his opinion the land was suitable for any residential use—R-12, R-20, R-90. The Planning Commission's report said that the requested R-12 zoning would not be in accord with the general zoning plan of Howard County but recommended approval of the request in light of the rezoning of the area to be used as a shopping center and the area to be used for garden apartments and the imminent availability of sewerage facilities and public water supply.

On January 18, 1965, the Commissioners issued their opinion and order finding that the land was suitable for any residential development from R-12 to R-90 and noting that the imminence of sewerage facilities made the developer feel it more desirable to develop the tract into small lots, while the residents of nearby developments felt this would be detrimental to their homes on larger lots. From the evidence, said the Commissioners, the applicant had not shown a change in the character of the neighborhood which would require or justify the requested rezoning. The application was denied.

The Chatham Corporation promptly filed a bill for a declaratory decree, setting forth its purchase of the land on December 3, 1964, its application to reclassify the tract from R-20 to R-12, the approval of the reclassification by the Planning Commission, the denial by the County Commissioners, and alleging that the denial was arbitrary, discriminatory and illegal because the evidence showed that Chatham would be deprived of any reasonable use of the land, that since the request was for a change from one residential use to another the Commissioners erroneously required a showing of either original error or subsequent change in the character of the neighborhood and erroneously applied that test in denying the requested change and, finally, that the evidence clearly showed a change in the neighborhood, and praying that the zoning regulations of Howard County as they applied to the land were invalid and void.

On May 10, 1965, Judge Macgill dismissed the bill, holding that the petition for reclassification from R-20 to R-12 was not analogous to an application for a special exception and that the error or change rule did apply in determining whether there

should be a reclassification to a higher residential density, that the evidence fell short of establishing that the R-20 zoning would deprive the owner of any reasonable use of its land, and that:

"This Court finds itself unable to say, on the evidence, that the action of the Board of Commissioners was other than fairly debatable. It may well be that an affirmative action would have been justified by the evidence but that is merely another way of saying the same thing. Cf. *Missouri Realty, Inc. v. Ramer,* 216 Md. 442. The bill of complaint will be dismissed."

No appeal was taken from this affirmance by Judge Macgill of the Commissioners but Chatham was not yet through. On June 14, a few days after the thirty-day period for appeal had passed, it filed another application for reclassification with the Commissioners "to reclassify that parcel of land of approximately 99 acres * * * shown on a plat attached hereto * * * from R-20 (residential) to R-16 (residential) and R-12 (residential)"; 61.35 acres were to be R-12 and 29.254 acres on the western part of the tract adjacent to the houses on R-20 lots in the developments of Valley Mede, Brinkleigh and Howard Heights were to be R-16 (no doubt in an effort to mollify and pacify the protesting homeowners in those developments).

Approximately eight and a half acres were to remain R-20 (apparently in the same area that was to have remained R-20 in the first application) for use as a park and for actual development as R-20 because of the road patterns there. The Planning Commission again noted that the requested R-16 and R-12 zoning would not be in accord with the general plan of Howard County but again recommended approval of the changes asked for from lower to higher residential density in light of the adjacent acres rezoned for shopping center and garden apartment uses and the imminent availability of sewerage and water.

Sec. 33.05 of the Howard County zoning regulations provides that if a petition for rezoning is denied, the Commissioners shall take no further action or another petition "for the same or substantially the same proposal on the same premises" for eighteen months with a proviso that a subsequent petition for the same or substantially the same proposal on the same prem-

ises may be filed after six months from the date of the hearing last held "if accompanied by an affidavit setting forth new and different grounds, which the petitioner believes would be sufficient for the approval of the proposal contained in the petition" and the Commissioners, if satisfied that the "new and different grounds or conditions exist" or would bear on the consideration of the proposal and justify another hearing, may order one. No affidavit was submitted with the second application (whether because the making of the affidavit would have been an admission that the proposal was the same or substantially the same or because the affidavit that there were new or different grounds or conditions which would justify a different result could not truthfully be made, does not appear) but the Commissioners, after a preliminary hearing, ruled that "the proposal is not substantially the same" and ordered a hearing.

The president and an owner of Chatham testified to the location and extent of the areas proposed to be developed R-16 and R-12 and again said there would be no development until both sewerage and water were actually installed, which would be very soon. A zoning expert who testifies frequently in rezoning cases said the requested change was "a reasonable and proper request for this Chatham tract of land" and that in his opinion "the R-12 and R-16, graduating out * * * in relation to these two high density areas, in relation to the sewer which you are installing now and the water line, make this a logical place for this slight increase in density."

On August 26, 1965, the Commissioners' opinion and order came down. It noted that the expert testimony was that the rezoning would be in conformity with good planning and would not have an adverse effect on surrounding properties, although they said the protestants produced evidence that the changes would be detrimental to the adjoining properties, that the Planning Commission thought that approval "would not be detrimental to the physical development of the general area" and would be a logical zoning step, and held that the Commissioners "being conscious and aware of the change, and constantly changing conditions in the general area of the subject property, and, in consideration of the advice and recommendations submitted by the Planning Commission of Howard County * * * [were]

now of the opinion" that the 61.355 acres bordering on the areas zoned for the shopping center and garden apartments should be reclassified, as requested, to R-12 and that the 10.5 acres close to Valley Mede, Brinkleigh and Howard Heights should remain R-20 (perhaps in further mollification and pacification of the residents of those developments), and 18.754 acres (of the 29.254 acres requested) should be rezoned R-16, as applied for.

Peter Beltram, the appellee, alone of many earlier protestants remained to fight on, a David still seeking to slay the corporate Goliath. He filed a bill in the Circuit Court to nullify the Commissioners' order of reclassification. A demurrer to the bill on the ground that the complainant had alleged no special damage entitling him to sue was sustained on December 15, 1965, "with leave to the said complainant to file his amended bill within fifteen days from the date hereof." Counsel prepared the amended bill, alleging that Mr. Beltram owned a home close to the property rezoned which would be cheapened and depreciated in value a minimum of three hundred dollars because of the rezoning, and mailed it on December 29 about 4:30 p.m. in Baltimore in an envelope properly addressed to the Clerk of the Circuit Court and with proper postage, in the belief that, as is customarily the case as Judge Macgill took judicial notice, it would arrive the next day, December 30, and be filed in time. Through the fault of the post office, it did not arrive until December 31, 1965, when it was filed by the clerk.

At the trial the defense of the Commissioners' actions was conducted largely by Chatham which had intervened. At the suggestion of Judge Macgill, it was stipulated by the County, by Chatham and by Beltram that the case would be tried and determined on the record before the Commissioners, including all exhibits (plats, general plans, the zoning regulations and so forth) in both the first and second applications, as well as the record of the first proceedings in court. Then counsel for Chatham said: "[W]e would like, however, to raise one point, in accordance with the case of *Dubay v. Crane*, 240 Md. 180, at page 185" (which held that by reason of the distance of their residences from the property involved, would-be appellants from the action of a zoning body had no standing to sue).

Counsel for Beltram then proceeded to begin to argue the case and when Judge Macgill discovered that Beltram, although a protestant of record, had not testified before the Commissioners that his property would be depreciated, he made it clear to counsel that there would have to be testimony on this point and granted a request that Beltram be allowed to testify, after hearing that Chatham was ready with two witnesses to rebut the claim that the rezoning would depreciate Beltram's property.

Beltram testified that he owned and lived in a house at 116 Paulskirk Drive in the Chatham development, which started about half a block from St. John's Road, that he paid $25,500 in fee for the property and he opined the rezoning would "devaluate the prestige of the neighborhoood which would in turn depress the market value of each home in the area." He said that of his own knowledge he knew that:

> "Part of the value of a home is the reputation that the neighborhood carries, and if the neighborhood is made up of high density houses it won't carry as much prestige and therefore as much market value as a consistently low density development."

He felt that his home would be worth several thousand dollars less with adjacent R-12 zoning than with general R-20 zoning. The plats in the record and the testimony show that the one hundred block of Paulskirk Drive is in Section One of Chatham and that R-12 zoning, if granted, would abut Section One and be close to Paulskirk Drive. Photographs of houses at 108 and 114 and 90 an 99 Paulskirk Drive were introduced by Chatham as typical of the houses it was intended to build on the abutting R-12 lots.

Chatham then offered expert testimony that there would be no diminution in value of adjoining houses if the rezoning came about.

Judge Macgill issued his opinion and decree on February 23, 1966. He found that Beltram lived in close proximity to the reclassified sections of the Chatham development and, noting that his property contained in excess of 20,000 square feet and that he believed the small lots with resulting increased density

nearby would depreciate his property by several thousand dollars, felt that he had standing to bring an equity proceeding—Howard County does not have a statutory appeal in rezoning cases—to challenge the action he had objected to below, citing among other cases *Baltimore v. N. A. A. C. P.,* 221 Md. 329, 335, and *Cassel v. City of Baltimore,* 195 Md. 348, 353.

Judge Macgill then found that the Commissioners, on the evidence before them, had not, and could not properly have, found any change between their first rejection of the rezoning and their later granting of essentially the same request so that their later action amounted to no more than an unsupported change of mind which legally being arbitrary and capricious must be declared invalid.

We think that Judge Macgill made no prejudicial errors in his rulings. He was justified in his finding that it was not the fault of Beltram that the amended bill was not filed on time and, since the time limit he specified was not inflexible under either statute or rule but, rather, had been set by the court, the time allowed could, in effect, be extended by the court, particularly since no one would be thereby prejudiced. *Cf. Newcomer v. Keedy,* 9 Gill 263.

Likewise there was no prejudice in allowing Beltram to testify as to his right to sue, after his counsel had begun his argument. Counsel for Chatham had raised the question of standing when the hearing began as one separate from the merits and were prepared to offer their testimony on the point immediately, and did so after Beltram had testified. It seems clear that if counsel for Beltram had been more artful than he was and had presented Beltram's testimony before argument began, no question would have been raised as to his right to do so. There was no abuse of discretion in permitting the testimony a few minutes later.

Since Beltram's evidence was that he owned property, in which he lived, in close proximity to the reclassified land and had said that from his experience high density and smaller lots depreciated neighborhoods and values—a claim Judge Macgill found plausible—there was no error in the ruling that Beltram had standing to sue. *Dubay v. Crane,* 240 Md. 180, 185, and the cases therein relied on, such as *Loughborough v. River-*

*mass,* 213 Md. 239, rightly were distinguished. In *Dubay* the protestant most likely to have had standing to sue lived 1500 feet away across the Beltway "which, if not a complete shield against the apartments to be constructed, will serve as an adequate barrier," and it appeared that the rezoning would aid rather than injure the value of nearby properties. *Cf.* also *Wilkinson v. Atkinson,* 242 Md. 231.

Chatham claims it was error for the court in the case now being appealed to have ruled that it must have shown mistake or change because R-16 and R-12 zones are analogous to zoning classifications permitted by special exception and so, under *Huff v. Bd. of Zoning Appeals,* 214 Md. 48, *Costello v. Sieling,* 223 Md. 24, and *Beall v. Montgomery County,* 240 Md. 77, are "floating" or non-Euclidean zones and not governed by the mistake or change rule.

The claim is not available to Chatham at this point. It made the same claim in the first case in the Circuit Court in which it sought to overturn the Commissioners' action in refusing to reclassify the land to R-12 and Judge Macgill found and held, explicitly and specifically, that neither the history of the Howard County zoning of land in an R-12 status nor the words and effect of the currently applicable zoning ordinance made R-12 zones analogous to special exceptions. No appeal was taken from this first decree based in large part on this rejection of Chatham's claim and Judge Macgill's ruling became the law of the case. If the matter were still open in this appeal from his second decree, we should agree with Judge Macgill on the point. The R-12 and the R-16 zones are typical Euclidean residential zones. They have the basic concepts of such zones, of set districts restricted as to the use and dimensions of the structures which may be put on them. Their restrictions are uniform. See Haar & Hering, *The Lower Gwynedd Township Case: Too Flexible Zoning or an Inflexible Judiciary?,* 74 Harv. L. Rev. 1552, 1553 (1961). A floating zone is a special detailed use district of undetermined location, a district in which the proposed kind, location, size and form of structures must be pre-approved, and which, like a special exception use, is legislatively pre-deemed compatible with the areas in which it may thereafter be located on a particular application, provided specified stan-

dards are gratified and actual incompatibility is not revealed. See Reno, *Non-Euclidean Zoning: The Use of the Floating Zone,* 23 Md. L. Rev. 105 (1963), and *Beall v. Montgomery County, supra.*

Chatham comes closer to the real points in the case in its arguments, made largely in oral presentation of its case, (a) that a more liberal and relaxed standard of what is change should apply in determining applications to rezone from lower to higher residential densities than in rezoning from residential to commercial or industrial uses, and that under these relaxed and liberal standards there was sufficient evidence of change to sustain the Commissioners' second action; and (b) that the difference between the conditions of the first application and those of the second were substantial enough to keep the first decision of the Circuit Court from being controlling and binding under the principles of *res judicata,* as reviewed and applied in *Woodlawn Ass'n v. Board,* 241 Md. 187. ("Whatever view may be taken of the applicability of the principles of the doctrine of res judicata to administrative or quasi-judicial determinations or actions of an agency, the text writers and the courts are in general agreement that the judgment or order of a court, including a trial court, which affirms or reverses such determinations or actions, ordinarily is," absent substantial and significant changes occurring between the first action one way and the second action the other way on the same or substantially the same proposal) ; in *Schultze v. Montgomery Co. Bd.,* 230 Md. 76; in *Whittle v. Bd. of Zoning Appeals,* 211 Md. 36, and see *Strickler v. Bd. of Co. Comm'rs,* 242 Md. 290.

It is true that in *Missouri Realty, Inc. v. Ramer,* 216 Md. 442, 449, we said that in considering whether change had occurred more liberality could be indulged in deciding whether to reclassify from one residential use to another than in a change from residential to commercial or industrial use, and it well may be, as Judge Macgill suggested in his first opinion, that had the Commissioners decided on the first application that sufficient change had occurred to warrant reclassification to R-12, their action would not have been judicially overturned, but they decided there had not been sufficient change and Judge Macgill affirmed on the ground that the correctness of the Commis-

sioners' action was fairly debatable and his ruling became final without an appeal having been taken. The cases leave no doubt that basically the error or change rule and the fairly debatable rule apply to and govern cases of residential rezoning. See *Reese v. Mandel,* 224 Md. 121, where the Board, despite persuasive evidence to the contrary, found no original error in classifying land R-40 and refused to reclassify to R-20, and this Court, speaking through Judge Prescott (who had written the opinion for the Court in *Missouri Realty*), reversing the circuit court, held that the evidence before the Board made the matter fairly debatable and upheld the Board, and *Renz v. Bonfield Holding Co.,* 223 Md. 34, upholding the refusal of the Board to reclassify from R-6 (individual and duplex homes on 6,000 square foot lots) to R-G (group or row houses).

On the question of whether there had in fact been any significant change between the time of the first decision and the second, we think Judge Macgill's analysis in his opinion in the second case is impeccable in its perception and accuracy. He said:

"The resolution [of the Commissioners in the second application] made no specific finding of a change in circumstances in the neighborhood since the last decision, nor of any subsequently discovered mistake in the existing classification. The report and recommendation of the Planning Commission was a recapitulation of the report and recommendation which had been submitted, considered and rejected by the Board at the first hearing. The availability of public water and sewerage was also a factor presented and presumably considered by the Board at its earlier hearing. It was discussed by this Court in its opinion in the case thereafter filed. The fact that the property was contiguous to land zoned for garden apartments and for a shopping center was no less a fact when the first petition was denied. It must be concluded that the only substantial change which led to the later action of the Board was a change of mind of a majority of its members. The ability to reconsider and change one's mind is, in most aspects of human endeavor, a virtue more

often than a vice. In matters such as this, however, it risks the danger of being labelled capricious."

We think it plain that the first judicial decision was *res judicata* and prevented the second action of the Commissioners unless the second proposal of Chatham was not the same or substantially the same as the first, and we cannot agree with the Commissioners and Chatham that the second application was essentially different from the first. The second was labelled as an application covering the same 99 acres that the first had covered. The Planning Commission considered the two proposals to be essentially the same. Its report and recommendation on the second was a recapitulation of those it submitted on the first and its conclusions were based on the same underlying assumptions and reasons. The second application sought increased residential density for some ninety acres and so did the first—under it, of the 99 acres 6 were to be kept as R-20 for a park and about 4 more were to be developed in fact as R-20. The same approximately 61 acres were sought for R-12 in both the first and second applications. The second application sought to classify some 29 acres as R-16, rather than R-12, seemingly to grease the squeaking wheels of the protestants in Valley Mede, Brinkleigh and Howard Heights. If the second application had been granted as asked for, instead of there being available as building sites some 220 lots, as would have been the case if the first application had been allowed, there would have been from 206 to 210 lots, a relatively slight decrease in density. In *Woodlawn* the statutory definition of an R-18 zone had been changed between the first and second applications for rezoning to the R-18 classification. At the time of the first application 950 garden apartments could have been built on the subject tract of land, at the time of the second only 800 to 850. We held that this was not such a change in conditions as avoided the principles of the doctrine of *res judicata,* being a difference in degree not significant in amount. In *Strickler* subsequent approval by the District Council of R-30 zoning (town houses) on tracts of land for which R-18 zoning (garden apartments) had been refused, was held to be arbitrary and capricious. We think the second proposal in the case before us did not differ in kind or in significant degree from the first, and that under

*Woodlawn,* and the authorities therein cited, the first decision of the Circuit Court was binding and controlling in the absence of change in pertinent law or facts and that there was no such change.

*Decree affirmed, with costs.*

PRESCOTT, C. J., dissents.