## TOWN OF SOMERSET ET AL. *v.* MONTGOMERY COUNTY BOARD OF APPEALS ET AL.

[No. 511, September Term, 1965.]

54

*Decided December 16, 1966.*

The cause was argued before HAMMOND, C. J., and HORNEY, OPPENHEIMER, BARNES and FINAN, JJ.

*Alfred L. Scanlan* and *Rourke J. Sheehan,* with whom were *Arthur G. Lambert, Plummer M. Shearin, Robert L. Higgins* and *Lambert, Furlow & Sheehan,* and *Shea & Gardner* on the brief, for appellants.

*Robert H. Metz,* with whom was *Robert G. Tobin, Jr.,* on the brief, for Montgomery County Council, part of appellees; *R. Robert Linowes,* with whom were *Linowes & Blocher* and *James R. Trimm* on the brief, for M. K. Fry, other appellee.

OPPENHEIMER, J., delivered the opinion of the Court.

This zoning appeal presents intertwined questions of due process of law in the procedure of the administrative agency, the construction of the zoning ordinance, the legal effectiveness of the appeal from the administrative order, and the proper limits of the lower court's discretionary action.

The appellee, M. K. Fry and her husband, since deceased, (the Frys), petitioned the Montgomery County Board of Appeals (the Board) for a special exception under the Montgomery County Zoning Ordinance, to construct and operate an apartment hotel in an R-10 zone (Multiple-Family, High-Density Residential) on their property at the southwest corner of the intersection of Wisconsin Avenue and Bradley Boulevard in Chevy Chase, Maryland. The lot area of the property covers about 79,000 square feet, of which 15,000 square feet or 18% of the lot would be occupied by the building. The proposed apartment hotel would have 11 stories and a penthouse, and would rise 100 feet above grade. There would be 169 units, of which 115 would be apartments, 22 hotel rooms, and 32 hotel suites. The building would include a barber shop, beauty parlor, coffee shop and pharmacy.

The property involved lies at the northern end of the residential section of Wisconsin Avenue. The Zoning Plan for the Bethesda Business District and vicinity, adopted in 1956, established Bradley Boulevard as a boundary line between the com-

mercial uses of the Bethesda Business District to the north and the residential area to the south.

Resolutions in opposition to the granting of the exception were filed, *inter alia,* by the Town of Somerset and the Village of Chevy Chase, two of the appellants. The Board's opinion states that a hearing on the petition was first scheduled for April 15, 1965, at 3:30 P.M. but was postponed to 10:00 A.M. on May 20, "to allow a full day for this hearing since the opposition was represented by two attorneys." At the hearing on May 20, Mr. Shearin, one of the attorneys for the opposition, stated he represented the Town of Somerset, two citizens' associations and a number of individuals, whose given addresses showed that they lived in the general vicinity of the property involved. Prior to the taking of testimony, a motion was made on behalf of the protestants to dismiss the application on the ground that, even if a special exception were permitted, the plans showed the proposed apartment hotel building would be a clear violation of the area, frontage and setback requirements of the Montgomery County Zoning Ordinance. The motion was denied.

At the conclusion of the testimony of the first expert witness offered by the Frys, Mr. Shearin, on behalf of the protestants, asked leave to cross-examine. The Chairman of the Board stated that cross-examination was not allowed. He admitted that cross-examination had been permitted "in the last few years," but "from this time forward" cross-examination of witnesses was not to be permitted. The Chairman said:

"We got into this about a month ago. We have taken the motion since our present rules of procedure do not specifically say, rather they are silent in this matter, we are conducting public hearings in the true sense of a public hearing rather than adversary trial, is what it had gotten into. You can call any witness you want. The petitioner in other contested cases such as this has made his witnesses available to be questioned by the opposition after he finishes his case. We feel if the petitioner [sic] hears the whole case, it eliminates a whole lot of questions. On that basis, right or wrong,

this is the way we have been proceeding for about the last month. We see nothing that requires an adversary trial."

Both Mr. Shearin and Mr. Sheehan, the other attorney for the protestants, stated they were taken completely by surprise, and had received no notice from the Board, through the press or otherwise, of the change in its procedure. An objection was taken to the Board's ruling, and the objection was duly renewed after cross-examination of each of the Frys' succeeding witnesses had been refused. After the Frys had concluded their case, the appellants recalled several of the Frys' experts as hostile witnesses.

The Board recessed at 3:30 P.M. On resumption of the hearing ten minutes later, before the appellants had concluded putting on the applicants' witnesses as their own (the procedure permitted by the Board instead of cross-examination), the Chairman of the Board announced that the taking of testimony would be concluded at 4:20 P.M. Both counsel for the appellants vigorously protested. They stated they had never been given to understand that any such time limitation would be imposed. The Vice-chairman of the Board, Mrs. Elaine Lady, dissented from the ruling. In her later dissenting opinion, she said, on this issue:

"1. The chairman's statement on April 15, 1965 that the hearing would be continued to May 20, 1965, to allow a full day, was not definitive, or preclusive of another continuance if all the witnesses had not been heard.

"2. The time limitation which was imposed late in the day, was not announced at the beginning of the hearing on May 20, 1965. The equal-time concept was stated after the proponents had presented their case and the counsel for the opponents had questioned a number of witnesses but not all they proposed to call.

"The Board ruled that the opposition must conclude their case within 50 minutes. Not having been forewarned at the beginning of the hearing, the opposition

had no opportunity to give priority of importance to witnesses, or to allocate the length of time for questioning individual witnesses for the purpose of presenting their case most effectively within the time allowed."

Mr. Shearin stated that he had four witnesses he wished to call, including Mrs. Slater, one of the appellants. Mr. Sheehan stated he wished to call as an expert witness an adjoining property owner, a builder, who had been waiting all day. Mr. Shearin, on behalf of the appellants, proffered "to show by the several witnesses who have not been allowed to testify that this proposed use would constitute a substantial and serious hazard to the safety of residents and workers in the area and particularly the children who live in the vicinity of the site in question here today. The mothers of some of those children are here prepared and ready to testify. We protest most vigorously this limitation which has been imposed upon us in the middle of the afternoon which prevents their testifying." A motion made by both counsel for the appellants to continue the case to a later date for the presentation of pertinent and relevant additional evidence was denied.

On June 2, 1965, the Board, by a vote of 4 to 1, adopted a resolution granting the special exception for which the Frys had applied. The opinion of the majority affirmed the rulings previously made as to the construction of the zoning ordinance, the denial of the right of the protestants to cross-examine the applicants' witnesses, and the notification to the protestants that they had to conclude their testimony in the afternoon of the day on which the hearing began.

On July 2, 1965, The Town of Somerset, The Village of Chevy Chase, Mr. and Mrs. Picken and Mrs. Slater filed an order for appeal from the Board's decision to the Circuit Court for Montgomery County. The order stated it was filed pursuant to Rules B1, *et seq.* of the Maryland Rules of Procedure. On July 12, the appellants filed a petition of appeal in the Circuit Court, in support of the order for appeal previously filed. Among the grounds stated in the petition for the reversal of the Board's order were its rulings on the interpretation of the zoning ordinance, its denial of the right to cross-examination, the time lim-

itation imposed by the Board and its refusal to grant a continuance. The Board's procedure, it was claimed, violated the appellants' constitutional rights. The petition also alleged that the applicants had failed to meet the burden of showing that the requirements for the granting of a special exception had been met.

Mrs. Fry demurred to the petition, under Maryland Rule B9, on the grounds, *inter alia,* that the petition failed to allege any of the appellants were aggrieved parties, or had sustained any damages; that the appellants were too far removed from the property involved to constitute them aggrieved parties; and that the Town of Somerset and the Village of Chevy Chase had no standing to appeal since no allegation of ownership of land was made in the petition and that, if they did own property, it was too far removed. The Board filed a similar demurrer.

On November 1, before decision on the demurrer, the appellants, while maintaining that the demurrer should be overruled, moved for leave to amend their petition of appeal. The motion stated that if leave were granted, the appellants would allege, *inter alia,* that each of them was a party to the Board proceedings; that each is aggrieved by the Board's decision; that the Pickens own and reside on property within approximately one block of the proposed apartment hotel; that Alice Slater is a resident and owner of property within three short blocks; that the Town of Somerset is located in the vicinity of the property involved and is the owner of property several blocks from and within sight of the building proposed to be erected thereon; that the Village of Chevy Chase is located across the street (Wisconsin Avenue) and is the owner of property to the southeast which is within sight of the proposed building; and that the property of each of the appellants will be specially damaged if the apartment hotel should be erected.

On November 22, Judge Shook filed an opinion and order. She held that the petition did not show that the petitioners were aggrieved by the decision of the Board and that therefore the demurrer must be sustained. On the motion for leave to amend, the judge considered the questions of law raised by the petition and concluded they were all without merit. She then decided, as a matter of law, that none of the appellants was an

aggrieved party because the record of the proceedings before the Board did not contain evidence to support their contentions. For these reasons, Judge Shook sustained the demurrer to the petition without leave to amend.

In view of the reasons upon which the order was based, the appeal to this Court involves not only the determination of the correctness of the trial judge's ruling on the pleadings and whether her discretion was abused in refusing leave to amend, but also the correctness of at least some of her legal conclusions as to the validity of the Board's procedure and the underlying substantive issues.

### The Rulings on the Pleadings

The petition of appeal did not in terms allege that the appellants were persons aggrieved by the Board's order. It did, however, state that the appeal was filed pursuant to Maryland Rules B1 through B12. The order for appeal, in support of which the petition was filed, contained the same statement. The pertinent Rules, therefore, were incorporated by reference in both the order and the petition. Rule B3 states that an appeal may be taken "by a person now or hereafter authorized by statute to appeal." The applicable statute authorizes appeals by a "person aggrieved by the decision." Montgomery County Code, Section 2-88 (1960) (now Section 2-92, 1965 recodification). See *Pattison v. Corby*, 226 Md. 97, 100, 172 A. 2d 490 (1961). It is a reasonable implication of the order and the petition that the appeal is taken by aggrieved persons, for only such persons are authorized to take an appeal under the Rules pursuant to which the appellants state they are acting.

The order for appeal was filed within the time set forth in the Rules. In that respect, the legal situation differs from that presented in *Warmack v. Bradley Club, Inc.*, 242 Md. 394, 219 A. 2d 12 (1966) and *Badian v. Hickey*, 228 Md. 334, 179 A. 2d 873 (1962). Unlike the case of *Salisbury Bd. v. Bounds*, 240 Md. 547, 214 A. 2d 810 (1965), in which it was held that the appeal should have been dismissed because the errors committed by the agency were not set forth in the order for appeal within the time required by Maryland Rule B2 e, the petition of appeal in the case before us was filed within the time

limit prescribed by the Rule and sets forth in detail the errors claimed to have been committed by the Board. Both the Board and the Frys were given due notice of the filing of the order and petition. The appellees knew from the proceedings before the Board that the parties to the appeal included some of the protestants, who, through their counsel, had given the location of the properties which they owned and had protested, as adverse to their interests, the granting of the application for the special exception and had objected to the Board's rulings and procedure.

Where there is compliance with the substance of the requirements of statutes or rules and the other parties have not been prejudiced, technical irregularities cannot be made the basis for depriving persons of the opportunity to assert their legal rights. *Board of County Comm'rs v. Kines,* 239 Md. 119, 125, 210 A. 2d 367 (1965) ; *Irvine v. Montgomery County,* 239 Md. 113, 117, 210 A. 2d 359 (1965). Because of the factors to which we have referred, we think that the appellants' failure to allege expressly in the petition of appeal that they were aggrieved parties whose property interests are or will be adversely affected by the Board's order was, at most, such a technical irregularity. The demurrer should have been overruled.

We find, further, that the trial judge erred in denying the appellants' motion for leave to amend. Maryland Rule 320 d 1(b) provides that "an amendment shall not be made without leave of court but leave to amend shall be freely granted in order to promote justice." We have repeatedly held that an order denying or allowing amendment will not be reviewed in the absence of a clear showing of an abuse of discretion. *Blevins v. Mullan Contracting Co.,* 235 Md. 188, 194, 201 A. 2d 348 (1964) ; *Carder v. Steiner,* 225 Md. 271, 277, 170 A. 2d 220 (1961), and cases therein cited. We re-affirm that rule, but, in this case, we are constrained to hold that in denying leave to amend the court below went beyond the proper limits of discretionary action.

Ordinarily, our holding that the demurrer to the petition of appeal should have been overruled would make moot the question of the judge's refusal to permit the requested amendment. However, the appellants' request to amend the petition by mak-

ing the allegations set forth was proper and perhaps necessary. The requested amendments were specific allegations as to the aggrievement of each of the appellants. The allegation in the petition which, as we have held, implied that they were aggrieved parties, without the supporting details of the requested amendments, of itself might not have been sufficient for them to show why they had standing to appeal. Had the motion been granted, the issue as to standing would have been clarified by the raising of pertinent questions of fact and law and the administration of justice would thereby have been served.

In determining whether an abuse of discretion has been shown, the reasons why the court decided as it did may be apposite, whether those reasons were stated or implied. *Blevins, supra,* and cases therein cited. In this case, Judge Shook carefully set forth the reasons for her decision. In large part, she rested her denial of the motion upon her conclusions that the legal contentions of the appellants as to errors made by the Board were without merit.[1] We differ from the trial judge as to at least two of these conclusions, and hold, as to them, that the contentions of the appellants are correct. For the reasons which will be given hereafter, we have decided that the denial by the Board of the appellants' request to cross-examine the applicants' witnesses was a violation of their rights, and that the proposed use of the property involved violated the building coverage and density requirements of the zoning ordinance, as we construe it. The judge's determination that the amendment should be denied, therefore, was based on conclusions of law which we find erroneous.

Beyond this, the judge erred in holding, on the circumstances of this case, that the appellants should not be allowed to allege that they are persons aggrieved by the Board's decision, because, in her opinion, the record of the proceedings before the Board contains no evidence to show aggrievement. At the be-

---

1. In considering the reasons for the judge's decision, we do not intimate that we approve the procedure of deciding the question of whether an amendment to a pleading based on the issue of standing should be considered on the basis of the legal contentions as to the merits of the appeal. This is not a case where the pleadings on their face showed there was no cause of action.

ginning of the proceedings before the Board on May 20, one of the attorneys for the protestants stated that, among others, he represented two of the appellants, whose addresses he gave. It is conceded that these appellants lived respectively about one block and three blocks from the property involved. Moreover, one of the reasons given by the appellants in their petition of appeal as to why the Board's action should be declared null and void was that, during the hearing, without prior warning or precedent, the Board imposed upon appellants an arbitrary time limitation of 50 minutes for the completion of their case and arbitrarily and capriciously overruled their motion for continuance of the hearing to a later date. Counsel for the appellants protested the time limitation and asked the Board for a continuance so that interested property owners in the immediate vicinity of the property, including one of the appellants, could show how they would be adversely affected by the granting of the special exception. We do not reach the question of whether this aspect of the Board's procedure violated due process, but in any case we believe it was essential, for the promotion of justice, that the appellants should have been accorded the opportunity to offer testimony to the court to show they were aggrieved persons, when that opportunity, whether through improper procedure or misunderstanding, had been denied them by the Board.

When the issue of the standing of an appellant to appeal is raised in the court in which review of the administrative action is asked, we have approved the practice of trial judges in permitting testimony on the point to be taken before them, see e.g., *Chatham Corp. v. Bellram*, 243 Md. 138, 148, 220 A. 2d 589 (1966) and *Wilkinson v. Atkinson*, 242 Md. 231, 218 A. 2d 503 (1966). The question is not one of taking additional testimony on the merits of the substantive issues decided by the Board [compare *Suburban Properties, Inc. v. Rockville Council*, 241 Md. 1, 5-6, 215 A. 2d 200 (1965) and cases therein cited], but of determining whether the appellants have the requisite standing to have those issues reviewed. When, as in this case, there is a serious question as to whether the appellants were wrongfully deprived by the Board of the right to offer testimony as to their specific interests and how those

interests would be adversely affected by the granting of the petition, there is all the more reason for the trial court to permit the filing of allegations and the taking of testimony thereunder to show the appellants' standing to appeal. In no other way, in our opinion, on the facts, could justice be served.

In *Brucker v. Benson,* 209 Md. 247, 254-56, 121 A. 2d 230 (1956), the plaintiff in a divorce case, after the taking of testimony but before entry of a final decree, sought leave to amend her petition to present claims based on alleged ownership of personal property. Leave was denied. The Court remanded the case on the ground that, while ordinarily the grant or denial of leave to amend is within the discretion of the trial court, the Chancellor had abused his discretion in denying the permission asked. Chief Judge Brune, for the Court, said: "We think, as we have said, that the appellant is entitled to present her claims * * * We are, therefore, of the view that leave to amend ought to have been granted and that the chancellor went beyond the proper limits of discretionary action in denying it." 209 Md. at 256. In the present case, we are of the opinion that the reasons for holding the trial judge went beyond the proper limits of discretionary action in denying leave to amend are even stronger than they were in *Brucker.*

The judgment of the trial court, therefore, must be reversed and the case remanded for further proceedings. While it is apparent that one of the appellants lives in a residential neighborhood only approximately one block from the proposed apartment hotel, and another about three blocks away, and while proffers were duly made before the Board to show how the appellants were aggrieved, the proffers were denied and we do not have sufficient testimony before us, in the present posture of the case, to determine the standing of the appellants as a matter of law. We proceed, however, to give our reasons for holding that the Board's action in denying the appellants the right of cross-examination was arbitrary, capricious and illegal, and that the Board and the court erred in their construction of the zoning ordinance. If it is finally determined that any of the appellants has standing to appeal, our conclusion as to the proper construction of the zoning ordinance will require a reversal of the Board's order in granting the special exception without further proceedings.

### The Board's Denial of the Right of Cross-examination

When the Board decided that the proceedings before it were not adversary in nature and that therefore the appellants did not have the right to cross-examine the witnesses of the applicants for the special exception, and when Judge Shook affirmed that decision, neither had the benefit of Chief Judge Prescott's opinion, for the Court, in *Hyson v. Montgomery County Council,* 242 Md. 55, 217 A. 2d 578 (1966).

In *Hyson,* Chief Judge Prescott, after a thorough examination of the cases and authorities, held, for the Court, that in a proceeding such as the one involved in the present case, reasonable cross-examination must be permitted. He found that the appellants had, in effect, waived their right to cross-examine "any specific witness or material" (242 Md. at 68) and that therefore there had been no prejudicial error, but his opinion makes clear the rule that in an adversary proceeding before an administrative board, the opportunity for reasonable cross-examination is a basic right. In the case before us, unlike *Hyson,* counsel for the protestants specifically claimed the right to cross-examine each witness offered by the applicants and consistently noted their objections to the Board's adverse rulings.

In *Gorin v. Board of County Comm'rs,* 244 Md. 106, 223 A. 2d 237, 239 (1966), we said, citing *Hyson*: "While proceedings before an administrative board are informal and the strict rules of evidence do not apply, when the board is funtioning in an adversary proceeding, the fundamentals applicable to the decision of adjudicative facts by any tribunal must be preserved"; and in *Travelers Indemnity Co. v. Nationwide Constr. Corp.,* 244 Md. 401, 224 A. 2d 285 (1966), we said that, however informal in nature the proceedings may be "[T]he fundamentals of fairness are requisite to the validity of an adversary proceeding in any tribunal." Compare *Union Investors, Inc. v. Montgomery County,* 244 Md. 585, 224 A. 2d 453 (1966).

In the argument before us, counsel for the appellees properly conceded that, under our decisions, the proceedings before the Board were adversary in nature, but they contend that the Board's procedure in allowing the appellants to call the applicants' experts and to examine them as hostile witnesses was

the substantial equivalent of the right of cross-examination. We disagree.

In the words of Mr. Justice Lamar, in *Interstate Commerce Comm'n v. Louisville & N. R. R. Co.*, 227 U. S. 88, 93 (1913) : "[T]he more liberal the practice * * * the more imperative the obligation to preserve the essential rules of evidence by which rights are asserted or defended * * * All parties must be fully apprised of the evidence submitted or to be considered, and must be given the opportunity to cross-examine witnesses * * * In no other way can a party maintain its rights or make its defense." The right of a party to call hostile witnesses as its own after the testimony of the adverse party has been completed, in our opinion, is not the substantial equivalent of the right to cross-examine immediately after the direct testimony of the witness has been concluded. The techniques of advocacy so essential to our system of justice are largely stultified when resort must be had to such a cumbersome and delayed substitute for immediate and direct cross-examination.[2]

The appellants' contention that actual prejudice must be shown before denial of procedural due process can be established is without merit. *Coe v. Armour Fertilizer Wks.*, 237 U. S. 413, 424 (1915) ; *Rees v. City of Watertown*, 86 U. S. (19 Wall.) 107, 123 (1873). See *Brookhart v. Janis*, 384 U. S. 1 (1966). See also *Schowgurow v. State*, 240 Md. 121, 213 A. 2d 475 (1965) and *State v. Madison*, 240 Md. 265, 213 A. 2d 880 (1965). It would be a mockery of justice to hold that a person cannot complain of the denial of the right to cross-examine unless he can show what the result of the cross-examination would have been; that result is often as unexpected as it is revealing. Chief Judge Prescott's statement in *Hyson*, at 242 Md. 71-72, that, under the circumstances, any denial of the right of cross-examination "has not been shown to have prejudiced the protestants' cause" is to be taken in the context of his finding that cross-examination, in effect, had been waived. There

2. In a somewhat similar situation, in Wadell v. Board of Zoning Appeals, 136 Conn. 1, 10, 68 A. 2d 152 (1949), the court said, in a pungent dictum: "A requirement of the board that attorneys desiring to cross-examine witnesses should ask questions though it would place an unjustifiable restriction upon their rights."

was no prejudice because there had not been, in substance, a denial of the right. In this case, the right had been vigorously and repeatedly asserted, and its denial vitiated the proceedings.

The ruling of the Board, before *Hyson,* that there was no right of cross-examination as a matter of law was understandable error, but the Board had accorded that right in similar proceedings for several years, and withdrew it without public notice or notice to the bar or even prior notice to counsel at the beginning of the hearing. This action was arbitrary and capricious and of itself, would have been ground for reversal of the Board's order.

### Construction of the Zoning Ordinance

Appellants alleged, *inter alia,* as one of the Board's errors in their petition of appeal that the use granted by the exception does not meet the lot area requirements of the zoning ordinance. Judge Shook disagreed with the contentions of the appellants on this point and upheld the conclusions of the Board. In essence, the appellants' argument was and is that the general area requirements of an R-10 zone—the classification of the property involved prior to the granting of the exception—are applicable to an apartment hotel special exception because the language and structure of the ordinance cannot be construed as removing these requirements in the case of an exception for an apartment hotel. The appellees contend that the construction of the ordinance given by the Board and the court below is in accordance with the law's meaning and intent. A detailed examination of the zoning ordinance is necessary to the resolution of this issue.

The zoning ordinance [3] defines a zone as follows:

> "Zone: An area within which certain uses of land and buildings are permitted and certain others are pro-

---

3. The Zoning Ordinance for Montgomery County was adopted as part of the Montgomery County Code pursuant to the authority given by the Legislature in Code (1957; 1966 Supp.), Art. 25A, § 5 (X). The Ordinance applies to that portion of the Maryland-Washington Regional District in Montgomery County, with certain exceptions not here relevant.

All subsequent references to the zoning ordinance sections are

hibited; yards and other open spaces are required; lot areas, building height limits, and other requirements are established; all of the foregoing being identical for the zone in which they apply." Section 104-2.

Section 104-4 contains General Regulations. It states: "Except as hereinafter provided, the following general regulations shall apply :" Section 104-4 c. (1) (a) reads:

> "c. Area.
> "(1) Yards and open spaces.
> "(a) No building shall be erected, nor shall any existing building be altered, enlarged, moved or rebuilt, nor shall any open space surrounding any building be encroached upon or reduced in any manner not in conformity with the yard, lot, area, and building location regulations hereinafter designated for the zone in which such building or open space is located, except as otherwise specifically provided."

The property involved is located in a R-10 zone. Section 104-13, entitled "R-10 Zone. Multiple-Family, High-Density Residential," sets forth specific requirements as to net lot area per dwelling unit and as to building coverage. By cross reference to Section 104-11 (R-30 Zone. Multiple-Family, Low-Density Residential), Section 104-13 states the uses permitted in the R-10 zone. One of these permitted uses is multiple-family and multiple-group dwellings, which are defined in Section 104-2 as apartment houses. In Section 104-13 b. it is provided that certain uses may be permitted as special exceptions in an R-10 zone "in accordance with the provisions of Section 104-22 through 104-29." [4] An apartment hotel is one of the special exceptions. An apartment hotel is defined in Section 104-2 as:

---

to the section numbers as they were at the time of the commencement of this litigation. In the 1965 recodification of the Montgomery County Code, the zoning ordinances are found at Section "111-" of the Code. The numbers following the hyphen are the same in both codifications.

4. Section 104-22 authorizes the Board to hear applications for special exceptions. Sections 104-23 and 26 contain the procedure as to the filing of the petition, notice and public hearings.

"Any building or portion thereof designed for or containing both individual guest rooms or suites of rooms and dwelling units provided, however, that the guest rooms shall number not less than ten percent (10%) of the total number of suites or dwelling units contained therein."

Section 104-13. c., which follows the provisions as to special exceptions, states that:

"c. Area requirements

(1) Net lot area. There shall be at least 1,000 square feet of net lot area per dwelling unit, but no dwelling shall be located on a lot containing less than 20,000 square feet.

(2) Building coverage. Not more than 12 percent of the net lot area shall be occupied by multiple-family dwellings.

(3) Green area. Not less than 50 percent of the net lot area shall be devoted to green area as defined in Section 104-2."

Section 104-28. b. states that special exceptions shall be subject to the height limitations laid down in the zone in which the property is located, with the right in the Board to increase the height limits if it finds the adjacent residential development will not be adversely affected.

The most important provisions on the issues involved are contained in Section 104-28. e. and 104-29. The first of these sections provides that: "Wherever in Section 104-29 no specific area, frontage or setback requirements are specified, then the area, frontage and setback requirements in the applicable zone will apply * * *" There follows a provision authorizing the Board to waive the minimum frontage requirements, if it finds the facilities for vehicular ingress and egress adequate, in certain specified special exception cases, among which apartment hotels are not included.

Section 104-29 is entitled "Uses for which special exceptions may be granted and specific standards relative thereto." Specific standards as to area, frontage and setbacks are provided as to airports, airparks and airfields, animal hospitals and child care homes, among other special exceptions. No spe-

cific standards of any kind are set forth as to apartment hotels, which are dealt with in 104-29. d-1. It is therein provided that a special exception may be granted as to an apartment hotel in certain zones, including R-10. There is the condition, in addition to those set forth in 104-27,[5] that the Board must find such a use will not constitute a nuisance "because of traffic, number of guests, noise or other factors." Certain commercial uses are also permitted which are not available to apartment houses in a R-10 zone unless they are located on a site of not less than 20 acres. Unlike the provisions in respect of other enumerated special exceptions, there are no provisions in respect of apartment hotels as to yard, lot, area and building locations. Under the provisions of 104-28. e., absent such specific provisions, the regulations provided as to the zone in which the property for which the requested special exception is located apply, even if the application for the exception is granted.

It is undisputed that the special exception granted in this case is contrary to the terms of the regulations pertaining to buildings in a R-10 zone. These regulations provide that the maximum permissible density is 43.5 dwelling units per acre; there must be at least 1000 square feet of net lot area per dwelling unit. Section 104-13. c. (1). The lot in question con-

---

5. Section 104-27 sets forth the general provisions subject to which the Board may grant a special exception. The applicant has the burden of showing, by a preponderance of the evidence, that the proposed use does not affect adversely the General Plan for the development of the District; that it will not affect adversely the health and safety of residents or workers in the neighborhood and will not be detrimental to the use or development of adjacent properties in the general neighborhood; and that the standards set forth for each particular use for which a special exception may be granted have been met.

Subsection 104-28. a. empowers the Board to add to the specific provisions of 104-27 others that it may deem necessary to protect adjacent properties, the general neighborhood, and the residents and workers therein.

The appellants contend that there was no sufficient evidence before the Board to support its findings that the general conditions of 104-27 and of 104-29. d-1. had been met, but we do not reach this question.

sists of 79,112 square feet, which, under the section, would permit a maximum of 79 dwelling units. The apartment hotel for which the special exception was granted is to have a total of 169 units, suites and rooms. Assuming, *arguendo,* that the 54 hotel rooms and suites are not dwelling units, the remaining 115 apartments exceed the maximum permitted by nearly 50%. Under 104-13. c. (2)., not more than 12% of the net lot area shall be occupied by multiple-family dwellings; the proposed apartment hotel would have a building coverage of 15,000 square feet, or 18% of the lot.

In our opinion, not only the express wording of the ordinance but also the obvious intent of the legislative body evidenced in the structure of the act make it clear that the Board's action in granting the special exception exceeded its powers. The various sections of the ordinance which we have quoted show, we believe, beyond question, that the express terms of the ordinance were violated. The structure of the ordinance evidences to us that the legislative body did not intend to give the Board the right to vary the express provisions as to density and lot area applicable in a R-10 zone. Where there was intent to alter such provisions, as in the case of child care homes, animal hospitals and other special exceptions, the ordinance carefully so provides. There is no similar provision as to apartment hotels. The only authorization to the Board to vary the applicable restrictions is as to the limitation of height. The careful enunciation of that single exception emphasizes the applicability of the zone restrictions where, as in the case of apartment hotels, the ordinance does not provide otherwise.

The appellees contend that if the express provision of Section 104-28. e. were followed literally, there would be no reason to seek a special exception for an apartment hotel, because the restrictions on the use of the land for an apartment hotel would be the same as those applicable to an apartment house, which is a permitted use in an R-10 zone. There are two answers to this argument.

If the statutory language is plain and free of ambiguity and has a definite and sensible meaning, it is conclusively presumed to be the meaning of the legislative body in enacting the statute; courts should not attempt, under the guise of construction,

to supply possible omissions or to remedy possible defects. *Secretary of State v. Bryson,* 244 Md. 418, 224 A. 2d 277 (1966), and cases therein cited. We find the language of the zoning ordinance comes within this rule. Compare *Gatewood v. State,* 244 Md. 609, 224 A. 2d 677 (1966).

Moreover, the contention that, under the zoning ordinance as we construe it, the provision as to a special exception would be meaningless, in our opinion, is fallacious. An apartment hotel, unlike an apartment house, contains rooms for transients, which, for all that appears to the contrary, may be a more profitable use of the space than would be apartments which are leased for fixed, substantial terms. Moreover, part of the apartment hotel can be leased for certain commercial purposes, although no such uses are permitted for an apartment house unless the lot contains at least 20 acres. The lot here involved contains only 1.8 acres.

The Board, in its majority opinion, stated that since an apartment house is not a zone in itself, the limitations of density, green area and building coverage do not apply. This is a *non sequitur.* Apartment hotels are authorized, under certain conditions, as an exception to the uses permitted in an R-10 zone, and the limitations of that zone as to density and building coverage apply to the exception, by the terms of the ordinance, because no other requirements are specified in Section 104-29. Mrs. Lady, in her dissenting opinion, succinctly pointed out the error in the majority's reasoning as follows:

> "Apartment Hotels are allowed as a Special Exception in the R-10 Zone. The 'Area Requirements' (104-13c) of the R-10 Zone is not a sub-section under 'Permitted Uses' (104-13a), nor is it a sub-section under 'Special Exceptions' (104-13b). On the contrary 'Area Requirements' is a section within itself and of the same titular importance as 'Permitted Uses' and 'Special Exceptions.' It applies to both a and b sections with equal authority."

The majority opinion of the Board refers to Ordinance No. 5-109 (1965) which modifies the definition of a "guest room" in the zoning ordinance. The definition, as modified, allows the

installation of kitchenettes in apartment hotels. The 1965 ordinance has no relevance to the issue. The Board's opinion states that an apartment hotel is not the same use as a multi-family apartment house, but that statement only evidences why an apartment hotel is treated as a special exception.

Judge Shook, in her opinion, finds that the minimum lot area provision of the R-10 zone applies but that the density and height provisions do not, because otherwise, she believes, the zoning ordinance would not make the granting of a special exception for an apartment hotel conditional upon the finding that such a use will not constitute a nuisance because of traffic, number of guests, etc. She finds significance in the reference to the "number of guests" and the subsequent statement, in reference to permitted commercial uses, as to the character of the apartment hotel. With respect, we do not follow this reasoning. The minimum lot provision, which the court states does apply, is in the same sentence of subsection 104-13. c.(1) which fixes the density provision which she finds not applicable. The conditions which an applicant for the special exception must meet go to policy considerations to be determined by the Board in deciding whether the exceptions should be granted, and have nothing to do with the specific requirements of the R-10 zone sections as to density and lot coverage, which under the clear language of the zoning ordinance, apply if the exception is allowed. Here, the Board has no discretion.

> *Judgment reversed, and case remanded for further proceedings in accordance with the above opinion; costs to be paid by appellees.*