JARVIS *v.* MAYOR AND CITY COUNCIL OF BALTIMORE

[No. 45, September Term, 1967.]

*Decided January 19, 1968.*

*Motion for rehearing filed February 15, 1968; denied February 15, 1968.*

The cause was argued before HAMMOND, C. J., and HORNEY, BARNES, McWILLIAMS and FINAN, JJ.

*Lloyd S. Mailman* for appellant.

*Clayton A. Dietrich, Chief Assistant Solicitor,* with whom were *Joseph Allen, City Solicitor,* and *Solomon Baylor, Assistant City Solicitor,* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

In 1938 the appellant (Mrs. Jarvis) and her (now deceased) husband bought 41 tax sale properties in Baltimore City. The 5 which concern us are 301, 303, 305, 307 and 309 N. Parrish Street. These lots, 45 to 50 feet deep and 10 to 12 feet wide, were improved by 2-story, 4 rooms and bath, brick row houses. The weekly rent was $9.00, which did not include gas, electricity or heat. The 5 properties, owned in fee simple, in the years 1960 to 1963 produced an average annual net return of $954.26. Mrs. Jarvis entrusted the management of all of her properties to her son-in-law, David F. Hayes.

There were no tenants in 305, 307 and 309 in the early spring of 1964. The tenant in 303 left during the first part of April. On 28 April, William Glick, an employee of the appellee (the City), inspected the properties and reported to the Bureau of Building Inspection that they were in poor condition and that 4 of them were vacant and open to the public. He directed the issuance of "30 day notices." On 21 May notices were sent to Mrs. Jarvis advising her that 305, 307 and 309 were "open to [the] public and in hazardous condition" and alleging the violation of certain ordinances. She was directed to "rectify [these conditions] by rehabilitating or razing [the] building[s]." She was ordered to obtain the necessary permits within 30 days (21 June) and to "correct these * * * conditions on or before" 22 June. Failure to comply, she was told, would "make it necessary to take action in accordance with the provisions of law." On the day following (22 May) identical notices were sent in respect of 303 and 301.

Mr. Glick made another inspection on 4 June. He reported no progress had been made and that the houses had been vandalized. On 11 June Mr. Hayes applied for, paid for, and obtained permits to rehabilitate the houses. He estimated, and the applications (and permits) so state, that the cost per house would be $200.00 and that the work would be completed by 11 September. He set his men to repairing the windows, doors and plaster and preparing the houses for the installation of plumbing. He explained that, in these circumstances, the doors, windows and plumbing are not put in place until a tenant is ready to move in, otherwise they would promptly be broken or stolen.

Charles F. Kesting, the City's supervisor of building inspection, inspected the properties on 15 July. He said the "windows were out," the "doors were out" and that "because no work had been done" he requested that "a ten-day legal action warning * * * be sent out" to Mrs. Jarvis. That such letters or notices were not sent is conceded.

On or about 21 July a police officer shot a man who lived at 306 N. Parrish Street. The ensuing excitement and agitation attracted the attention of the press and some local minis-

ters, one of whom, the Rev. Mr. Marcus Wood, testified as follows:

> "After the shooting incident, we received word that there was tension in the community, so I went in the community as a minister and I saw the condition, the vacant houses and so on, and I then came down to the Mayor's office; I discussed the situation with the Mayor [Theodore R. McKeldin] and he said, 'I'll go up there.' He called his chauffeur and took us up to Parrish Street, and Channel 13 news cameras were there. We went into the vacant houses, they were already open."

Mr. Wood said the Mayor "promised that he would have Mr. Deitrich [Buildings Inspection Engineer] * * * see that remedial steps would be taken almost immediately."

There was other testimony produced by the City but little of it rose above the level of adjectival generalities such as "squalid, dilapidated slum areas," and vague references to "drinking, glue sniffing and wild parties."

The record does not disclose what, if anything, the Mayor did about it. About a week later, however, on 27 July, Mr. Deitrich issued a work order to Harford Contracting Co., directing it to raze the dwellings at 303-5-7-9 N. Parrish Street. Since Harford was the lowest of 3 bidders it seems reasonable to assume that the project had been under way for some days before 27 July.

Early in the morning of 29 July, Mr. Hayes, who had just returned from a week's vacation, visited the properties. The doors and windows had been repaired and were ready to be replaced, and "extensive plastering [had been] done on the inside." The houses were ready for occupancy, he said, and when a tenant could be obtained the doors, windows and plumbing would "be installed approximately simultaneously with the occupancy of the house." The properties had not been posted or boarded up by the City and neither he nor Mrs. Jarvis had any warning of the impending demolition. Satisfied with the efforts of his workmen Mr. Hayes went off on some other business. Later in the day, after a call from his wife, he hurried back to

Parrish Street and saw for himself that the houses were gone.

Mr. Hayes pointed out in his testimony that there was a common wall between 301 and 303 and that in razing 303 considerable damage had been done to the wall and to the roof of 301. He patched the roof but the cost of repairing the wall was more than he felt justified in spending. When the tenant, who had become apprehensive about the wall, moved out he had the house demolished. The suit against the city for damages was filed in October 1964.

The case was tried before Sodaro, J., without a jury, on 7 November 1966. In an opinion filed 16 November he found as a fact that the properties were "a public nuisance," that they were "unsafe and unsanitary," that they "constituted a menace to the public health" and that the City's decision to raze the properties was proper. He held "that the City under the provisions of the applicable City Ordinances had the right to raze the properties." He also found that Hayes had expended $561.00 for labor and materials prior to the demolition and $75.00 on 301 after the demolition. Judgment was rendered in favor of Mrs. Jarvis against the City for $636.00. Both Mrs. Jarvis and the City have appealed.

I.

Mrs. Jarvis contends the trial judge has misconstrued the applicable ordinances. The City, oddly enough, disclaims the ordinances and insists that, since neither party introduced them into evidence, there was nothing for the trial judge to construe. We think it likely that he had the ordinances in mind, at least, because he held that "under the provisions of the *applicable City Ordinances*" the City had the "right to raze the properties." (Emphasis supplied.) However, we shall agree with the City that the ordinances are not properly before us. *Strickler v. Bd. of Co. Commrs.*, 242 Md. 290, 298, 219 A. 2d 58 (1966).

The City points to the court's finding that the properties were a "public nuisance" and a "menace to the public health" and, in these circumstances, it argues, it was wholly justified, under the police power alone, in abating the nuisance in any peaceable manner, citing *Md. Tel. Co. v. Ruth,* 106 Md. 644, 68 Atl. 358 (1907) ; *Honolulu v. Cavness,* 364 P. 2d 646 (Hawaii

1961) ; and *Perepletchikoff v. Los Angeles,* 345 P. 2d 261 (Cal. 1959). It is true, of course, that summary action may be necessary in an emergency to protect the public health or safety, *Deems v. M. & C. C. of Balto.,* 80 Md. 164, 30 Atl. 648 (1894), but the situation presented here is, in our judgment, a long way from that kind of emergency.

There is nothing in the record to suggest that Mr. Glick's visit on 28 April was anything more than a routine inspection. His report (on 303—the only one in evidence) consists of a mimeographed form, of the "Yes—No" type, upon which he placed check marks in some of the blank squares. The information thereby conveyed was to the effect that 303 was a row house which had been vacant for a year or more and "need[ed] extensive work to be made habitable," that the roof was in place, no walls were missing, windows and doors were broken or unlocked, that no condemnation notice had been posted nor was there a "For Sale" or "For Rent" sign in evidence, that there was no indication of fire in the structure, which contained rubbish and debris, that the grounds were unsanitary, that the property was not on the tax delinquency list, that the general quality of the block was poor and that there were more than 4 vacant structures in the block on both sides of the street. Mr. Glick's recommendation that a 30 day notice be sent hardly signifies an emergency, and even less does the fact that 24 more days passed before the notices were actually mailed.

The notice itself did not have about it an air of urgency. It advised Mrs. Jarvis that her building was "open to [the] public and in hazardous condition." Nothing was said about its being a "public nuisance" or a "menace to the public health." She was given the choice of "rehabilitating or razing" it. It purported to be a "condemnation" notice (the word "violation" was stricken out and "condemnation" inserted) but she was given another 30 days in which to obtain a "proper permit," which seems odd in view of the statement, in the notice, that completion was required within the same 30 days.

Mr. Glick's report that his inspection on 4 June indicated no progress and that vandals had been active does not seem to have excited anyone. Mr. Hayes obtained the permits on 11 June, within the 30 day period. Each permit states the com-

pletion date to be September 1964, a leisurely pace scarcely to be associated with the concept of emergency. The permit also stated that it did not "extend the time limit given by the enforcement division nor excuse the appearance for hearings," suggesting that nothing drastic would happen without an opportunity to be heard.

Mr. Kesting visited the neighborhood on 15 July. The record does not disclose just what he inspected or precisely what his findings were but he said he requested the sending of a "10 day notice." That no one bothered to see to the sending of such a notice tends to negate the idea that an emergency was at hand. The notion persists that the only emergency extant was the desirability of placating an emotionally aroused neighborhood with some sort of an overt act. There is nothing in the record to show that the destruction of Mrs. Jarvis' property reasonably could have been expected to accomplish such a purpose or that such a purpose had, in fact, been accomplished. We think it is entirely clear that this was not an emergency situation.

Less than 6 months ago we considered the efforts of the town of Midland to accomplish the demolition of a structure known as the "Opera House." *Burns v. Midland,* 247 Md. 548, 234 A. 2d 162 (1967). Judge Oppenheimer, for the Court, said:

"A basic requirement of due process in any adversary proceeding, whether that proceeding be private litigation or the exercise of governmental power against an individual, is that the person proceeded against be given notice and an adequate opportunity to contest the claim against him. *Travelers v. Nationwide,* 244 Md. 401, 406, 224 A. 2d 285 (1966), and authorities therein cited. These requirements may not be applicable when the necessity for summary action in an emergency situation to protect the public health or safety is clear. *Deems v. M. & C. C. of Balto.,* 80 Md. 164, 30 Atl. 648 (1894) ; see also *Adams v. Commissioners of Trappe,* 204 Md. 165, 173-74, 102 A. 2d 830 (1954) ; *Camara v. Municipal Court,* 387 U. S. 523, 18 L. Ed. 2d 930, 941 (1967) ; and Annot. 14 A.L.R.2d 73, 78 (1950). Absent such an emergency,

even though the scope of a legislative enactment is within the police power, action under the enactment is invalid unless the procedure complies with constitutional requirements. *Londoner v. Denver,* 210 U. S. 373 (1908) ; *Camara, supra; Town of Somerset v. Board,* 245 Md. 52, 65-67, 225 A. 2d 294 (1966) ; and cases therein cited." *Id.* at 553.

It is not possible to conclude, from the evidence in this record, that Mrs. Jarvis had *any* notice of the City's intention to demolish her property, nor that she was given *any* opportunity to contest it. The trial judge's holding to the contrary must, of course, be reversed.

## II.

Despite his finding that the City had the right to raze the property, which, as we have said, was erroneous, the trial judge awarded Mrs. Jarvis $561.00 "for labor and material for the partial work done on the four houses" and $75.00 for the repair of the roof of 301. In light of what we have said, however, we think Mrs. Jarvis was also entitled to have considered the other evidence of damage which appears in the record and which was not controverted. Mr. Sandler, a real estate expert, said each property was worth $1,500.00, that each lot still owned by Mrs. Jarvis was worth $360.00, making each house destroyed worth $1,140.00. Mr. Hayes, using somewhat the same figures arrived at a valuation of $1,100.00. Mr. Hayes also spoke of an average annual net income of $954.26 for the 5 houses. Then there is the cost of razing 301 which Mr. Hayes said was $350.00. Of course, the trier of fact was not bound by such evidence, even though the City made no effort to counter it by opposing testimony. Nevertheless, such evidence should not have been ignored. We shall remand the case for such further proceedings as may be necessary to resolve the matter of the damages to be awarded to the appellant.

*Judgment reversed.*

*Case remanded for a new trial on the single issue of additional damages. Costs to be paid by the appellee.*